[No. 2120–2. Division Two. April 28, 1977.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM C. BATTEN, *Appellant*.

*James J. Solan, Jon Parker,* and *Parker & Johnson,* for appellant (appointed counsel for appeal).

*Curtis Janhunen, Prosecuting Attorney,* for respondent.

PETRIE, C.J.—The defendant, William C. Batten, was convicted on two counts of first–degree murder while armed with a deadly weapon. He was sentenced to confinement for two terms of life to be served consecutively. We affirm those sentences.

■ We note, initially, that Mr. Batten challenges the jurisdiction of the state courts because, as stated in his motion, the crimes are "alleged to have occurred within an enclave of the United States Government . . ."[1] For purposes of resolving this issue we will assume that the crimes occurred within the exterior boundaries of the Quinault Indian Reservation in Grays Harbor County. However, the defendant does not contend that "anyone involved in this case is or was Indian." Accordingly, the state courts have jurisdiction to hear and determine the issues presented. *Draper v. United States,* 164 U.S. 240, 41 L. Ed. 419, 17 S. Ct. 107 (1896). *See also Tonasket v. State,* 84 Wn.2d 164, 525 P.2d 744 (1974); *Comenout v. Burdman,* 84 Wn.2d 192, 525 P.2d 217 (1974).

Additionally, the defendant contends he was deprived of a fair trial because of several pretrial and trial errors. He asserts the court erred when it (1) denied his motion to suppress physical evidence unlawfully seized at his residence; (2) permitted the State to remove and examine pubic hair seized from his person; (3) permitted an expert witness to express an opinion with less than the requisite

---

[1]The information alleges merely that the crimes were committed within Grays Harbor County, and the evidence in the record before us does not establish affirmatively that they were committed on the Quinault Indian Reservation, but all parties appear to agree that the situs of the crimes was inside the reservation boundaries.

degree of certainty; (4) admitted into evidence numerous gruesome and inflammatory photographs of the victims; (5) erroneously defined the term "premeditation" to the jury; and (6) denied his request to waive a jury trial.

Before examining these issues we focus briefly on several of the revolting facts of this case. On April 18, 1975, the semi-nude bloodied bodies of two women, 19 years of age, were found on top of sleeping bags in a makeshift shelter amid driftwood piled along the Moclips River near the ocean beach in the vicinity of Moclips, Washington. Each victim's hands were bound tightly at the wrists with twine, and autopsies revealed that each had died several days previously as a result of deep penetrating stab wounds which severed major arteries.

Two paper items were found at the scene of the crime on April 19 "next to the shelter, buried in sand." One was a Puget Sound Power and Light Company receipt stub bearing the name of William C. Batten, together with an envelope addressed to Mrs. Karlene Batten (the name of defendant's wife); the other paper had markings indicating that it was a carbon copy of a letter intended for Mrs. Batten.

During the afternoon of April 19, several deputy sheriffs, not yet aware of the papers which had been found at the crime scene, were conducting a general house-to-house canvassing effort in an attempt to locate anyone who might have seen the young women in the area. While they were at the residence of the defendant's parents, approximately one-half mile from the scene of the crime, a member of the family mentioned that William Batten had recently said he had picked up a couple of girl hitchhikers. Mr. Batten was shown a picture of one of the victims, and he stated, "possibly it was one of the girls he had given a ride."

William Batten had previously been known to the Grays Harbor County Sheriff's Office. The sheriff's file revealed that on February 15, 1967, he had been committed to Western State Hospital as a sexual psychopath following an arrest on charges of indecent liberties and burglary.

The essence of the foregoing factual recital was incorporated into an affidavit which was executed by a sheriff's detective and presented to a magistrate on April 21 as the basis for obtaining a warrant to search the apartment occupied by the defendant's parents and the adjacent trailer which he and his wife occupied.

The affiant also recited that on April 19 he had discussed the homicides with defendant's father. At that time, the affiant averred, the father questioned, somewhat rhetorically: "when did this happen . . . about two days ago?" and also "and they were stabbed, right?" Neither the fact that several days had elapsed before the bodies were found nor the fact that the women had been stabbed to death had been revealed to the public when the defendant's father made those comments. Nevertheless, both facts were confirmed by the autopsies which had been performed earlier that same day.

The defendant does not challenge the foregoing facts or the propriety of using them in the affidavit in support of the search warrant. He does contend, however, that those facts are insufficient to support the warrant, and that two other significant portions of the affidavit either constituted unreliable hearsay or were obtained in violation of law. The hearsay items, found in the sheriff's file, indicated that in 1967 several teen–age children accused Mr. Batten of being a voyeur and several others related that he had inflicted upon them a series of assorted assaults, some involving knives. The other information, allegedly unlawfully released by the Grays Harbor–Pacific County Community Mental Health and Family Services Center, pursuant to a court order, indicated that the defendant was then currently receiving therapy from that agency and that, as recently as November 1974, he had been in serious difficulties including child abuse.

The magistrate issued the search warrant, and several deputy sheriffs immediately conducted the search. They seized a pair of trousers and several knives. One of those knives, a so–called butcher knife, was found in "the second

drawer, right–hand side, of a kitchen cabinet" in the trailer occupied by the defendant.

The defendant was arrested on April 25. Within 6 hours after his arrest, he told an officer of the Washington State Patrol that in the evening of April 14 he encountered two young women (whom he had earlier that day transported to the beach area) at a campfire along the beach, that he accompanied them into a driftwood shelter, that he tied the girls' wrists with twine he had in his pocket, that he attempted to gag them, that one of them screamed, and that he then "lashed out with the knife he had brought with him and stabbed the girl a few times." Thereupon, he related to the officer, he knew "he would have to silence the second girl because if he didn't she would tell on him." He did stab the other woman, left the shelter, heard one of them moan, and then "went back inside and stabbed her two more times . . ." Finally, he related to the officer that he returned home, washed the blood off his hands and knife, "replaced the knife into the kitchen drawer where he had obtained it in the first place" and placed his clothing in his father's woodbox.

Subsequently, Mr. Batten reduced his confession to writing in substantially the same form as he had previously narrated to the patrol officer. He signed it in the presence of several deputy sheriffs, and it was presented to the jury as part of the State's evidence.

The expert opinion evidence to which the defendant assigns error was elicited from a Federal Bureau of Investigation analyst. After the blood–soaked sleeping bags had been sent to the FBI laboratory in Washington, D.C., the analyst found, on one of the bags, a pubic hair which did not match that of either of the victims. This hair was subsequently compared with several pubic hairs taken from the defendant's body by order of the court after his arrest. Comparison microscope analysis indicated that the hair samples taken from Mr. Batten were consistent in 15 different microscopic characteristics with the one hair found on the sleeping bag. On the basis of those observations, an

FBI analyst told the jury: "I concluded that that particular hair found on the sleeping bag could have come from Batten."

The jury returned a verdict of guilty to both counts of first–degree murder, and Mr. Batten has appealed to this court.

Clearly, the records maintained at the mental health center pertaining to Mr. Batten are confidential and, without his written consent, "shall not be admissible as evidence in any legal proceeding . . ." RCW 71.05.390. The court order directing release of that information was obtained in direct violation of that statute. For purposes of this opinion, therefore, we will assume (without deciding) that the sufficiency of the affidavit must be resolved without benefit of or reference to the information obtained solely from those records.[2]

The challenged hearsay portion of the affidavit is a two–page sheriff's investigative report dated February 7, 1967 (incorporated in the affidavit by reference), which purports to list comments recited to the investigating officers by 11 teen–age children to whom he talked after a report had been received that the Moclips Community Club had been broken into. The following excerpts are typical of the comments on the report:

---

[2]The issue of "probable cause" to support the issuance of the search warrant was not raised at trial until the defendant filed a post–trial motion for new trial. No fact–finding hearing was ever conducted to ascertain precisely what information was gleaned solely from the mental health records. However, from the general nature of the format of the affidavit, we exclude all information within that portion of the affidavit which is enclosed within semi–colons as follows:

[T]hat the mental health records regarding William C. Batten, maintained by the Grays Harbor–Pacific County Mental Health Center, indicate that Batten is presently receiving therapy from that agency and has had serious difficulties, including child abuse, as recently as November, 1974, that in 1971, William C. Batten was convicted of auto theft in Sacramento, California, for which he was committed to a State Penitentiary, being released on parole after six months of incarceration, at which time he returned to the State of Washington; . . .

1. A 16–year–old boy:

I saw Bill Batten under Community Club, on 1–29–67 and was carrying a hunting knife. He drilled holes in the floor to the girls rest room so he could watch them.

2. An 11–year–old girl:

About 2–3 weeks ago Bill Batten was under the bathroom at the Community Hall looking at me when I was in the bathroom.

3. An 11–year–old boy:

About one month ago Bill Batten tied me upside down with a rope on a pole and then ran away.

4. A 13–year–old girl:

He slapped me on my behind three weeks ago. Bill Batten grabbed me from behind and placed his hands on my breast.

The investigative report closes with the notation: "On 2–8–67 Prosecutor Brown contacted for warrant and possible Mental Hearing." Obviously, the report provided the foundation for filing the charges of burglary and indecent liberties which led to his commitment as a sexual psychopath on February 15, 1967.

■ When an affidavit upon which a search warrant is sought contains hearsay information, the search warrant may issue if, on final analysis and under all of the circumstances set forth in the affidavit, complaint or testimony laid before the issuing judicial officer, a substantial basis for crediting the hearsay is found and probable cause is shown. *State v. Patterson,* 83 Wn.2d 49, 515 P.2d 496 (1973). In the case at bench, there does appear to be "a substantial basis for crediting the hearsay."

The reliability of the hearsay information is established not only by the consistency of the pattern of activity furnished by the 11 teenagers, but also by the circumstance that a week later the target of the hearsay complaints was committed as a sexual psychopath pursuant to a petition filed for that purpose following his arrest for indecent liberties and burglary.

■ The antiquity of the hearsay limits the weight an issuing magistrate should ascribe to the data furnished, but it need not be totally devaluated. The somewhat ancient

hearsay content of the affidavit supplies only a minor step in the demonstration that evidence of the crime probably will be found in the premises to be searched.

If, in the considered judgment of the issuing magistrate, an adequate showing has been made under oath of circumstances going beyond suspicion and mere personal belief that criminal acts have taken place and that evidence thereof will be found in the premises to be searched, the warrant should be held good. *State v. Patterson, supra.*

In the case at bench, we find that the totality of the circumstances set forth in the affidavit provided a sufficient basis for the magistrate to have issued the warrant.

Next, Mr. Batten contends that the court violated his constitutional right against self–incrimination, his right of privacy, and his right to be free from unreasonable searches and seizures when it ordered removal of his pubic hair after his arrest. CrR 4.7(b)(2)(vi) permits the taking of samples of blood, hair, or other materials which do not involve unreasonable intrusion of a defendant's body. "Testimonial compulsion" is constitutionally protected; "bodily condition" is not. *See Schmerber v. California,* 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966); *State v. Kelly,* 3 Wn. App. 888, 478 P.2d 246 (1970).

We find no error in ordering the defendant to submit samples of his pubic hair for analysis and possible subsequent use against him in a criminal trial if that analysis provides relevant evidence material to the issues presented at trial.

However, the defendant contends that the expert witness who testified as to the results of that analysis failed to express a conclusion in terms of "probability" that the two sets of hair samples came from the same individual. Instead, the witness expressed a conclusion merely that the "particular hair found on the sleeping bag could have come from Batten." This testimony, the defendant contends, was calculated to inflame the jury by permitting them to infer that the victims had been sexually molested when *medical* evidence presented by the prosecution negated any such

molestation. Additionally, he contends, the "could have" language in the conclusion lacks a requisite certainty to give any efficacy to the opinion. Hence, he asserts, the testimony should have been stricken as a matter of law.

Mr. Batten misconceives the nature of the expert witness' testimony. The purpose of opinion evidence is to assist the trier of fact in correctly understanding matters not within common experience, but, in passing upon the admissibility of such testimony, the court has a duty to see that the jury is not likely to be misled. *Hill v. C. & E. Constr. Co.*, 59 Wn.2d 743, 370 P.2d 255 (1962).

The critical portion of the expert witness' testimony in the case at bench was his explanation that "there are about fifteen different variations between individuals which we look for on the basis of which we make our microscopic comparison of hairs." He observed as to those 15 variations, that the single reddish–brown Caucasian pubic hair found on the sleeping bag exhibited the same microscopic characteristics as the hair samples ordered taken from the defendant after his arrest.

Those observations demand a logical conclusion lest the unelucidated foundation testimony be misleading and prejudicial. *State v. Golladay*, 78 Wn.2d 121, 470 P.2d 191 (1970). The imprecise conclusion expressed by the witness reflects upon the present "state of the art" of scientific examination of hair. There is an apparent inability, under techniques utilized by this analyst, to identify hair with sufficient uniqueness so that—as with the case of fingerprints—two exhibits can be categorized as coming from or being produced by the same individual.

The witness stated, in effect, that he examined the two specimens by all the identification methods presently available to him and he is unable to state categorically that the two specimens came from different individuals. Hence, he is forced to conclude only that they "could have" come from the same individual. The size of the universe from which the two specimens may have come is a matter of some significance subject to further examination by either

party, but the absence of the nature of that universe does not destroy the probative value of the fact that scientific examination under presently existing limitations did not negate the possibility they came from the same individual. The conclusion of the witness was based upon his professional knowledge and skill as an expert. The testimony, therefore, was admissible, if otherwise material. *State v. Barton,* 5 Wn.2d 234, 105 P.2d 63 (1940).

Further, the value to the prosecution of the consistency of the two specimens lies in the implication that Batten could have been at the scene of the murder, not that he could have sexually molested the victims. The weight given to the expert's conclusion toward proof of that material issue is a matter to be resolved by the trier of fact. *State v. Duree,* 52 Wn.2d 324, 324 P.2d 1074 (1958).

Somewhat similarly, the same expert, on direct examination, stated that a small piece of plastic, which was found lying over one of the wounds inflicted upon one of the victims, contained a cut "which measured about one and five-eighths inches in length." He also testified that the knife which was found in Mr. Batten's kitchen "was one and five-eighths inches in width" along the widest portion of the blade.

On direct examination, he did not express any conclusion based upon those observed facts. However, on cross-examination, in response to a question which suggested that the witness had no information as to the number of knives with similar measurements, the witness replied:

> I believe my conclusion, in the manner that I stated it, was that the cut in the piece of plastic was produced by a sharp cutting instrument. I did not specify which instrument did in fact produce the cut. Along also with my conclusion, I pointed out that the width of the cut was consistent with the width of the knife, and based on this, it is my opinion that that knife could have produced that cut.

Asked to concede that there are many other knives that could have done the same thing, the witness responded: "I

think that the cut could have been produced by another sharp cutting instrument, yes."

The defendant contends that the witness' initial response on cross–examination constituted prejudicial misconduct which denied the defendant a fair trial, particularly after the trial court had apparently denied the prosecutor's offer to elicit the same type of "could have" testimony from the same witness on direct examination. We note that the response on cross–examination was not challenged when it was made, and that the defendant's confession expressly indicates that he used the same knife to stab the victims. The ultimate opinion expressed by the witness—"that that knife could have produced that cut"—is based in part upon the professional knowledge and skill of the witness. Hence, it is admissible. *State v. Barton, supra.*

■ Next, the defendant contends that numerous photographs of the scene of the crime and of the autopsy were gruesome, inflammatory, and repetitious. We do not find them unduly repetitious. They do help to explain the scene of the crime. They do help to clarify the autopsy surgeon's testimony. They are gruesome—as were the crimes.

The trial court previewed each of the proposed exhibits in camera and permitted both sides to argue their admission or exclusion. One exception to the preselection procedure was allowed. It allowed the jury to see precisely how the small piece of plastic was found lying on one victim's back. We find no abuse of discretion. *State v. Ferrick,* 81 Wn.2d 942, 506 P.2d 860 (1973).

The instruction defining the term "premeditation" is exactly the same instruction approved by the court in *State v. Lanning,* 5 Wn. App. 426, 487 P.2d 785 (1971). We find no error.

Finally, the defendant contends the court erred when it did not grant his request to waive a jury trial.

■ The record indicates that the defendant actually withdrew his request. Furthermore, criminal causes will be tried to the court only after a defendant has obtained "consent of the court." CrR 6.1(a). Failure of the court to

consent to a defendant's request to waive a jury trial is reversible error only when the court's exercise of discretion is clearly untenable or manifestly unreasonable. *State v. Thompson,* 88 Wn.2d 13, 558 P.2d 202 (1977); *State v. Jones,* 70 Wn.2d 591, 424 P.2d 665 (1967). Under the facts of this case, a trial court would not have abused its discretion in denying consent.

Judgment and sentence are affirmed.

REED, J., and JOHNSON, J. Pro Tem., concur.

Petition for rehearing denied May 20, 1977.

Review denied by Supreme Court September 29, 1977.