[Nos. 5083–1–III; 5948–1–III. Division Three. April 16, 1985.]

The State of Washington, *Respondent*, v. William
T. Flett, *Appellant.*

278

*Joseph Nappi, Jr.,* and *Hemovich & Nappi,* for appellant.

*John G. Wetle, Prosecuting Attorney,* and *Steven L. Olsen, Special Deputy,* for respondent.

THOMPSON, J.—William T. Flett appeals a jury verdict finding him guilty of two counts of second degree rape on the Spokane Indian Reservation. We affirm.

During the evening of August 6, 1981, a birthday celebration was held at a site near the Spokane River within the Spokane Indian Reservation. Bill Flett and the complaining witness, an enrolled member of the Spokane Indian Tribe, were 2 of the estimated 30 to 40 people in attendance at the party.

The victim and her daughter left the party at approximately 11:30 p.m. and returned to their respective homes. At approximately 2:30 a.m., August 7, Bill Flett left the party site in the company of two companions, one of whom was the son of the complaining witness. Mr. Flett spent the

next hour or two making various stops at individuals' homes, ultimately arriving at the victim's home sometime prior to dawn.

The victim testified that Mr. Flett forcibly entered her home, claiming he was looking for his wife. After she refused to have intercourse with Flett, she testified he threw her on the couch and, following a struggle, forcibly raped her twice.

Refusing his request to drive him home, the victim told Mr. Flett to take her son's motorcycle. He did so, but returned later that morning as the son was arriving home. He took Mr. Flett home and returned to the residence. Noticing traces of vomit in the bathroom, he asked his mother if she was all right. She replied, "I'm just upset" and asked if he "took the bastard home".

The victim was employed at a local grocery store and went to work that morning at approximately 10 o'clock. Shortly thereafter she phoned her daughter, who was employed at the Indian Health Center, and asked her to come to the store. When the daughter arrived at the store, the victim, shaking and crying, related that Bill Flett had raped her and that his wife had just been into the shop. She asked her daughter to obtain medication from a nurse at the Center.

On August 28, 1981, an information was filed charging William Flett with two counts of second degree rape. He was convicted by a jury in a December 15, 1981, trial. The trial judge sentenced Mr. Flett to two concurrent 10–year prison terms, suspended. Mr. Flett appeals and the State cross–appeals the sentence suspension.

Mr. Flett questions the jurisdiction of the State of Washington to prosecute the rape charges since they occurred on the Spokane Indian Reservation. Resolution of this issue necessitates review of state and federal jurisdictional statutes.

18 U.S.C. § 1153 provides:

Any Indian who commits against the person or property of another Indian or other person any of the follow-

ing offenses, namely, murder, manslaughter, kidnaping, rape, carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

"Indian country" is defined in 18 U.S.C. § 1151 as:

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights–of–way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state . . .

The first federal jurisdictional statute of general applicability to Indian reservation lands was enacted as Act of Aug. 15, 1953, ch. 505, Pub. L. No. 83–280, 67 Stat. 588 (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321–26, 28 U.S.C. § 1360). The act added section 1162 to Title 18, and granted full state criminal jurisdiction over offenses committed in Indian country in California, Minnesota, Nebraska, Oregon, and Wisconsin. Alaska was added to the group in 1958 by Act of Aug. 8, 1958, Pub. L. No. 85–615, § 1, 72 Stat. 545 (codified at 18 U.S.C. § 1162(a), 28 U.S.C. § 1360(a)); section 6 of the act gave the remaining states an option to amend their constitutions or statutes to remove any legal impediment to the assumption of jurisdiction by providing:

Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: *Provided,* That the provisions of this Act shall not

become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be.

In 1963, RCW 37.12.010 was enacted to assume state jurisdiction and provided in part:

The state of Washington hereby obligates and binds itself to assume criminal and civil jurisdiction over Indians and Indian territory, reservations, country, and lands within this state in accordance with the consent of the United States given by the act of August 15, 1953 (Public Law 280, 83rd Congress, 1st Session), but such assumption of jurisdiction shall not apply to Indians when on their tribal lands or allotted lands within an established Indian reservation and held in trust by the United States or subject to a restriction against alienation imposed by the United States, unless the provisions of RCW 37.12-.021 [tribal consent] have been invoked, except for the following:

(1) Compulsory school attendance;
(2) Public assistance;
(3) Domestic relations;
(4) Mental illness;
(5) Juvenile delinquency;
(6) Adoption proceedings;
(7) Dependent children; and
(8) Operation of motor vehicles upon the public streets, alleys, roads and highways: . . .

The effect of the statute was to assume civil and criminal jurisdiction over Indians and Indian territory within the state. But, except in eight listed subject matter areas, jurisdiction would not extend to Indians on trust or restricted lands unless the affected Indian tribe requested it. *Washington v. Confederated Bands & Tribes of Yakima Indian Nation,* 439 U.S. 463, 58 L. Ed. 2d 740, 99 S. Ct. 740, 743–44, *reh'g denied,* 440 U.S. 940, 59 L. Ed. 2d 500, 99 S. Ct. 1290 (1979). *See also* F. Cohen, *Federal Indian Law,* ch. 6, §§ C3–C3(a)(3), at 361–72 (1982). Since the Spokane Indian Tribe has not requested or consented to the assumption of state jurisdiction, the title status of the property where the offense was committed determines state

authority to prosecute. If the property is tribal or allotted land within the reservation and is either held in trust by the United States or subject to a restriction against alienation imposed by the United States, the superior court does not have jurisdiction.

The parties agree that the victim held title to the property in fee simple through a deed derived from an original patent issued by the United States in 1921. In 1972, she leased the land to the Spokane Tribal Housing Authority (Authority) in consideration for construction of a home pursuant to a HUD–funded housing project. The lease was not recorded. The Authority then leased the house back to her and she regained possession as lessee through a Home Buyer's Ownership Opportunity Agreement dated October 1, 1983. Thus, the land is still owned by the victim in fee while the Authority holds a leasehold interest as a means of financing home construction.

Mr. Flett argues that the Authority leasehold interest and the restrictive nature of the federal regulations involved in this housing project bring the property within the characterization of tribal land subject to restriction on alienation. Mr. Flett cites two federal regulations as authority for this contention: (1) 24 C.F.R. 805.218(a)(2) (1980), which provided in pertinent part:

> (2) "Trust or restricted land" includes "tribal land" or "individually owned land" as defined in 24 CFR 131.1. "Tribal land" under 24 CFR 131.1 means land or any interest therein held by the United States in trust for a tribe, or land or any interest therein held by a tribe subject to federal restrictions against alienation or encumbrance. "Individually owned land" under 24 CFR 131.1 means land or any interest therein held by the United States in trust for an individual Indian, or land or any interest therein held by an individual Indian subject to federal restrictions against alienation or encumbrance, including allotted land.

and (2) 24 C.F.R. 805.425(b) (1980), which provided in pertinent part:

> (b) *Designation of Successor by Homebuyer.* A Home-

buyer may designate as a successor only a person who, at the time of the designation, is a member of the Homebuyer family and is an authorized occupant of the home in accordance with the MHO Agreement, or if the designation is made before completion of the home, is a member of the Homebuyer's family and is scheduled to be an occupant when the home is completed.

The definition of "tribal lands" for HUD funding purposes and the regulations concerning successors to home buyers under the program do not necessarily satisfy the state jurisdiction statute, however. "Tribal lands" for the purpose of applying state jurisdiction have been generally defined in *Somday v. Rhay,* 67 Wn.2d 180, 184, 406 P.2d 931 (1965) as "lands within the boundaries of an Indian reservation held in trust by the federal government for the Indian tribe as a community . . ." "[A]llotted lands" are:

> grazing and agricultural lands within a reservation, which are apportioned and distributed in severalty to tribal members, title to the allotted lands being held in trust and subject to restrictions against alienation for varying periods of time.

*Somday,* at 184.

Resolution of the issue has more recently required a determination of whether the alleged offense occurred on *fee* or *nonfee* land. *Confederated Bands & Tribes of Yakima Indian Nation,* 439 U.S. at 468 n.5 (citing *Confederated Bands & Tribes of Yakima Indian Nation v. Washington,* 552 F.2d 1332, 1334–35 (9th Cir. 1977)).

Given the undisputed fact that the land upon which the offense was committed is held in fee by the victim, the lease and accompanying HUD regulations appear to serve only as a device to enable her to finance the construction of the home on her land. As the trial court correctly concluded:

> The manner in which [she] financed the building of her home did not create a restraint on alienation imposed by the United States upon [her] land; nor did the United States acquire legal or equitable title to said land to hold in trust.

Moreover, since only the Legislature has the authority to

retrocede jurisdiction duly assumed under RCW 37.12.010, *see* AGO 9 (1972), and has not done so in the case of the Spokane Tribe, we hold the State of Washington had jurisdiction to prosecute the rape charge.

 Mr. Flett next contends that expert testimony was improperly admitted regarding pubic hair samples allegedly found near the sofa. His objection is based on the assertion that the expert was unqualified and the hair sample analysis was unreliable. ER 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The admissibility of expert testimony under this rule depends on whether (1) the witness qualifies as an expert; (2) the opinion is based upon an explanatory theory generally accepted in the scientific community; and (3) the expert testimony would be helpful to the trier of fact. *State v. Allery,* 101 Wn.2d 591, 596, 682 P.2d 312 (1984); *State v. Canaday,* 90 Wn.2d 808, 585 P.2d 1185 (1978). The trial court must evaluate both the relevance of the testimony and its prejudicial impact, excluding unnecessarily cumulative or unfairly prejudicial testimony. *State v. Petrich,* 101 Wn.2d 566, 575, 683 P.2d 173 (1984); *see* ER 402, 403.

Whether a witness is qualified to testify as an expert on a particular subject is a discretionary question for the trial court. *Walker v. Bangs,* 92 Wn.2d 854, 858, 601 P.2d 1279 (1979); *Keegan v. Grant Cy. PUD,* 34 Wn. App. 274, 282, 661 P.2d 146 (1983).

> The witness need not possess the academic credentials of an expert; practical experience may suffice. Training in a related field or academic background alone may also be sufficient. [ER] 702 states very broadly that the witness may qualify as an expert by virtue of knowledge, skill, experience, training, *or* education.

(Footnotes omitted.)

*Harris v. Robert C. Groth, M.D., Inc., P.S.,* 99 Wn.2d 438, 449, 663 P.2d 113 (1983) (quoting 5A K. Tegland, Wash. Prac., *Evidence* § 289 (2d ed. 1982)); *see State v. Brooks,* 16 Wn. App. 535, 539–40, 557 P.2d 362 (1976) (witness who had received training in ballistics and done considerable research and study in area could testify as ballistics expert even though primary field of expertise was serology and tool–marking comparison).

Mr. Morig testified to holding bachelor's and master's degrees in chemistry; 12 years' experience in immunology or allergy labs; and 6 years' experience as a Washington State criminologist during which time he took several courses involving research techniques on physiological materials and other types of physical evidence examined in the crime laboratory. Since no showing was made at trial of deficiencies in Mr. Morig's qualifications and no abuse of discretion is apparent, this challenge is without merit. Furthermore, once basic requisite qualifications are established, any deficiencies in an expert's qualifications go to weight, rather than admissibility of testimony. *In re Young,* 24 Wn. App. 392, 397, 600 P.2d 1312 (1979).

The admissibility of testimony involving the field of hair comparison is also challenged as being unreliable and inexact. Mr. Flett correctly points out that expert testimony is not permitted if it is speculative in nature and a witness cannot properly express an opinion on the facts. *Crowe v. Prinzing,* 77 Wn.2d 895, 898, 468 P.2d 450 (1970).

Testimony based on hair analysis has been approved and admitted in Washington, however, on numerous occasions. *See State v. Golladay,* 78 Wn.2d 121, 470 P.2d 191 (1970), *overruled on other grounds in State v. Arndt,* 87 Wn.2d 374, 553 P.2d 1328 (1976) (overruling dicta); *State v. Bauman,* 77 Wn.2d 938, 468 P.2d 684 (1970); *State v. Bradfield,* 29 Wn. App. 679, 685, 630 P.2d 494, *review denied,* 96 Wn.2d 1018 (1981); *State v. Fagundes,* 26 Wn. App. 477, 483, 614 P.2d 198, 625 P.2d 179 (1980); *State v. Batten,* 17 Wn. App. 428, 437, 563 P.2d 1287, *review denied,* 89 Wn.2d 1001 (1977); *see also* Annot., *Admissibil-*

*ity and Weight, in Criminal Case, of Expert or Scientific Evidence Respecting Characteristics and Identification of Human Hair,* 23 A.L.R.4th 1199 (1983); 5 K. Tegland, Wash. Prac., *Evidence* § 104 (2d ed. 1982).

Here, Mr. Morig testified that based on physical examination of such characteristics as color, width, continuity of medulla, pigment granules, and cuticle structure, Mr. Flett could not be excluded as a source of the pubic hair sample examined. The trial court was in the best position to assess the reliability of the theory, methodology, procedure, and probative value of the expert testimony, *State v. Maule,* 35 Wn. App. 287, 295, 667 P.2d 96 (1983), and we will not disturb its discretionary admission absent abuse. *Petrich,* at 575.

We are next asked to determine whether the victim's statements, "I was raped", made to her daughter 7 hours after the alleged incident, and "Something upset me . . . did you take the bastard home?" spoken to her son at least 2½ hours after the alleged incident, were inadmissible as hearsay. ER 801(c) provides: "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

ER 802 provides: "Hearsay is not admissible except as provided by these rules, by other court rules, or by statute."

ER 803(a)(2) provides:

**(a) Specific Exceptions.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . .

(2) *Excited Utterance.* A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

ER 803(a)(2) is based upon the assumption that under the defined circumstances there is little chance of misrepresentation or conscious fabrication. The key to the exception is spontaneity. 5A K. Tegland § 361, at 206–07;

*accord,* Orland & Tegland, *Federal Rules of Evidence: Washington Follows the Federal Model,* 15 Gonz. L. Rev. 277, 395 (1980).

The principal elements of the exception are a sufficiently startling event and a showing that the declarant was still under the stress of excitement while making the statement. 5A K. Tegland § 361, at 206; *see State v. Dixon,* 37 Wn. App. 867, 871–73, 684 P.2d 725 (1984).

The passage of time between the startling event and the alleged excited utterance is a factor to be considered by a court exercising discretion to admit into evidence an alleged excited utterance, *Dixon,* at 873; *State v. Woodward,* 32 Wn. App. 204, 206–07, 646 P.2d 135 (1982); *see also Brown v. Spokane Cy. Fire Protec. Dist. 1,* 100 Wn.2d 188, 195–96, 668 P.2d 571 (1983), but is not solely determinative, *State v. Fleming,* 27 Wn. App. 952, 956, 621 P.2d 779 (1980).

As to the statement made to the daughter, the trial court ruled that events which transpired in the 7–hour period— the rape, the original request for medication, and the stress of contact with Mrs. Flett in the store just prior to the statement—were all part of a "continuous process" satisfying the elements of the excited utterance exception.

The facts support the existence of the requisite startling event, and the reliability and spontaneity of the statement is apparent in the record based on the continuing stress experienced and exhibited by the victim. In the absence of abuse of discretion, the trial court's determination will not be disturbed. *See Brewer v. Copeland,* 86 Wn.2d 58, 73, 542 P.2d 445 (1975).

Mr. Flett likewise challenges the admissibility of the statements to the son, "Did you take the bastard home?" and "Something upset me".

■ The first statement was not offered to prove the truth of the matter asserted; therefore, it is not hearsay. The second is admissible under ER 803(a)(3), which provides:

(3) *Then Existing Mental, Emotional, or Physical Condition.* A statement of the declarant's then existing

state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

"Something upset me" is a statement referring to her then existing mental and emotional state and the fact, by inference, it refers to a past event does not take it out of the scope of the rule, since it is reasonable to believe the condition existed at the time of the utterance, as well.

Ordinarily, if the victim's state of mind is not in issue, evidence of fear or other emotions is not relevant. 5A K. Tegland § 366, at 221; *see also State v. Parr,* 93 Wn.2d 95, 98–99, 606 P.2d 263 (1980); *Raborn v. Hayton,* 34 Wn.2d 105, 208 P.2d 133 (1949). Here, the statement was relevant to show the presence of continuing stress, to justify admitting the excited utterance, and to address the issue of lack of consent. The relevance and possible prejudicial effect of the offered testimony were weighed by the trial court. Admitting the two statements was not an abuse of discretion.

Finally, the State's cross appeal raises the issue of whether the trial court erred in suspending the sentences.

Trial courts lack inherent authority to suspend a sentence absent a specific legislative grant of power to do so. *State v. Bird,* 95 Wn.2d 83, 622 P.2d 1262 (1980); *State v. Hall,* 35 Wn. App. 302, 309, 666 P.2d 930 (1983) (Ringold, J., concurring in result). That grant of power is found in RCW 9.92.060 which provides in pertinent part:

Whenever any person shall be convicted of any crime except murder, burglary in the first degree, arson in the first degree, robbery, carnal knowledge of a female child under the age of ten years, or rape, the court may in its discretion, at the time of imposing sentence upon such person, direct that such sentence be stayed and suspended until otherwise ordered by such court, and that the sentenced person be placed under the charge of a parole or peace officer during the term of such suspen-

sion, upon such terms as the court may determine: . . .

The language of this general punishment statute allows the court to exercise its discretion at sentencing to suspend the sentence imposed for all convictions except those listed. Only burglary and arson are referred to by degree. Rape is not designated by degree.

When the original language of this statute was enacted by Laws of 1909, ch. 249, § 28, pp. 896–97, the crime of rape had no degree distinctions. *See* Laws of 1909, ch. 249, § 183, pp. 942–43.

In 1981, new rape statutes were enacted and rape was classified as first, second, and third degree. RCW 9A.44.040, .050, .060 (formerly RCW 9.79.170, .180, and .190, amended by Laws of 1979, 1st Ex. Sess., ch. 244, § 1, p. 1987, effective July 1, 1979).

RCW 9A.44.045 provides in part:

> No person convicted of rape in the first degree shall be granted a deferred or suspended sentence except for the purpose of commitment to an inpatient treatment facility: *Provided,* That every person convicted of rape in the first degree shall be confined for a minimum of three years . . .

█ As distinguished from the general provisions of RCW 9.92.060 which are found under RCW Title 9, Crimes and Punishments, RCW 9A.44.045 specifically applies to sentencing under the sexual offenses chapter and restricts suspension of sentences for first degree rape only. *See generally State v. McCullum,* 28 Wn. App. 145, 155, 622 P.2d 873 (1981), *rev'd on other grounds,* 98 Wn.2d 484, 656 P.2d 1064 (1983); *but see State v. Osborn,* 87 Wn.2d 161, 166–67, 550 P.2d 513 (1976). None of the subsequent statutes referring to lesser degrees of rape, RCW 9A.44.050–.090, contain such a restriction. Thus, we conclude RCW 9.92.060 gives the court authority to suspend the two sentences and the word rape as used in RCW 9.92.060 is restricted by RCW 9A.44.045 to first degree rape only. Therefore, the court had the authority to suspend the sentence for second degree rape.

For the foregoing reasons, we affirm.

McInturff, A.C.J., and Munson, J., concur.

Reconsideration denied May 20, 1985.