[No. 55576-6-I.   Division One.   March 20, 2006.]

Morrissey Warner et al., *Appellants*, v. Regent Assisted Living et al., *Respondents*.

*Brian C. Armstrong, Lory R. Lybeck,* and *Elizabeth A. Cooper* (of *Lybeck Murphy, L.L.P.*), for appellants.

*Pamela M. Andrews* (of *Johnson Andrews & Skinner, P.S.*), for respondents.

¶1 AGID, J. — Two elderly adults were allegedly mistreated while residing at Sterling Park, a Regent Asisted Living facility. The trial court granted Sterling Park's motion for summary judgment on Morrissey Warner's claim for neglect under the vulnerable adult statute (VAS), chapter 74.34 RCW. The VAS provides an independent cause of action for vulnerable adults who are neglected, as that term is defined in the statute. The standard of proof is different from that required to prove a

common law medical negligence claim. Under the VAS statutory standard, Warner presented sufficient evidence to create a genuine issue of material fact about whether he endured pain and suffering as a result of neglect. We reverse the trial court's summary judgment order and remand for further proceedings.

¶2 The trial court also granted the facility's motion to dismiss Helen Mantooth's assault claim after it excluded her hearsay statement, the only evidence that there was an assault. While we hold that Mantooth's dementia does not render her hearsay statement per se inadmissible, the record supports the trial court's conclusion that the statement was not an excited utterance. The trial court properly excluded the statement, and we affirm its order dismissing Mantooth's assault-related claims.

## FACTS

¶3 Plaintiffs/Appellants are the children of elderly adults who resided at Sterling Park. They filed a complaint alleging several causes of action on behalf of their parents, based on alleged events and conditions at Sterling Park. The trial court ruled on numerous claims, but the only ones at issue on appeal are Helen Mantooth's assault claim and Morrissey Warner's claim for neglect under the VAS.

*Morrissey Warner*

¶4 Morrissey Warner and his wife Rosemary lived at Sterling Park. Morrissey had dementia and was wheelchair bound. His children filed a claim on his behalf under the VAS, alleging that he was neglected as that term is defined in the statute. They submitted declarations claiming Sterling Park failed to provide basic housekeeping and hygiene necessities. Mary Goehring, Patty Burnett, and Margaret Smith each alleged they routinely found Warner in dirty clothing and soiled incontinence pads. On one occasion, they found him in his wheelchair in urine-soaked pants that were in such bad condition they had to be thrown out. Smith said one time she found him lying in bed covered in feces.

¶5 Warner's daughters also stated that in October 2002, Sterling Park did not provide necessary treatment and medication after a biopsy on Warner's head to remove a cancerous growth. Warner went four days without the medication. Sterling Park acknowledges it failed to provide the medicine when it should have.

¶6 The facility moved for summary judgment on several claims, including Warner's claim for neglect under the VAS. The trial court ruled that Warner's children's statements were only generic allegations and did not "establish the tort of negligence." It also held that Warner had to provide expert medical testimony establishing that the failure to timely provide medication resulted in harm and damages. It granted Sterling Park's motion.

*Helen Mantooth*

¶7 Helen Mantooth moved into Sterling Park in February 2002. She was 91 years old and had been diagnosed with dementia and bipolar disorder. Around 11:15 AM on November 30, 2002, Mantooth approached the front desk angry and crying.[1] She told the staff member at the desk that before breakfast a man had tried to make her take a shower even though she told him she already took one and that he tried to climb in bed with her. When assisted living aide Daniel Lujan passed by in the lobby, she identified him as the man. Mantooth's accusation is documented in several Sterling Park records, including an Event Report, Nurses Notes, and Alleged Abuse Interview Forms.[2] Her statement is the only evidence that something inappropriate happened. Mantooth died on July 6, 2003, and her family filed a lawsuit based on her allegations.

¶8 Sterling Park records show that Mantooth had grown increasingly agitated and aggressive in the months leading

---

[1] This is the account of the front desk staff member to whom Mantooth initially reported the alleged event. Regent's records contain varying accounts of what Mantooth said about the event and when it happened.

[2] The staff member who received Mantooth's initial report chronicled it in an Alleged Abuse Interview Form.

up to the alleged event. She had several physical altercations with other residents, and two days before the alleged attack, she accused Sterling Park aides of laughing at and mocking her. The day before, she had approached the front desk in a very agitated state and yelled and struck out at a staff member.

¶9 Mantooth's psychiatrist, Dr. Robin Capwell, said in his deposition that he examined her on December 6, 2002. He classified her dementia as "moderate" and said it had likely been progressing since 1998. Her increasing agitation and aggressiveness were consistent with dementia and bipolar disorder. He thought she should be at a higher level of care based on the level of her dementia. When asked about Mantooth's November 30, 2002 allegation, Dr. Capwell said that "a person with an advanced state of dementia possibly compounded by sensory limitations can misconstrue events and become delusional or paranoid about something that they are sure occurred and didn't. That is not uncommon. I can't say it's the case here. It's not uncommon." Although he could not assess the accuracy of a moderately demented person's report of an event, he also could not say the report was untrue. He said that in evaluating somebody with Mantooth's degree of dementia, he "would rely on some other corroboration of what was reported."

¶10 Sterling Park filed a motion to dismiss Mantooth's assault claim, arguing that there was no evidence of an attempted assault because Mantooth's statement to the staff was inadmissible hearsay. The trial court agreed and, after excluding the hearsay statement, dismissed Mantooth's assault-related claims.

## DISCUSSION

### I. *Morrissey Warner's Claim Under the VAS*

¶11 Morrissey Warner's family argues that the trial court erred by granting summary judgment on Warner's claim for neglect under the VAS. They contend that expert

testimony is not required to support a claim for neglect under the statutes. The facility argues that the trial court properly found that Warner failed to provide specific evidence of neglect or of the harm or damages suffered as a result of any neglect.

■ ¶12 An appellate court reviews summary judgments de novo, performing the same inquiry as the trial court.[3] Summary judgment is proper only when there is no genuine issue about any material fact and the moving party is entitled to a judgment as a matter of law.[4] We consider all facts and reasonable inferences in the light most favorable to the nonmoving party.[5] Questions of fact may be determined as a matter of law when reasonable minds can reach only one conclusion.[6]

■ ■ ¶13 The VAS provides that "in *addition to other remedies available under the law*, a vulnerable adult who has been subjected to . . . abuse . . . or neglect . . . while residing in a facility . . . shall have a cause of action for damages on account of his or her injuries, pain and suffering, and loss of property sustained thereby."[7] The VAS created a new cause of action to protect vulnerable adults from "abandonment, abuse, financial exploitation, or neglect."[8] The VAS defines neglect as

(a) a pattern of conduct or inaction by a person or entity with a duty of care that fails to provide the goods and services that maintain physical or mental health of a vulnerable adult, or that fails to avoid or prevent physical or mental harm or pain to a vulnerable adult; or (b) an act or omission that demon-

---

[3] *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002).

[4] CR 56(c).

[5] *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994).

[6] *Hartley v. State*, 103 Wn.2d 768, 775, 698 P.2d 77 (1985) (citing *LaPlante v. State*, 85 Wn.2d 154, 531 P.2d 299 (1975); *Balise v. Underwood*, 62 Wn.2d 195, 381 P.2d 966 (1963)).

[7] RCW 74.34.200(1) (emphasis added).

[8] *Schumacher v. Williams*, 107 Wn. App. 793, 798, 28 P.3d 792 (2001), *review denied*, 145 Wn.2d 1025 (2002).

strates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety.[9]

¶14 Warner alleges that he demonstrated neglect through his adult children's declarations about Sterling Park's failure to provide basic hygiene necessities and medicine to treat a biopsy site on his head. Warner's daughters routinely found him in dirty clothing and dirty incontinence pads. One daughter explained that "when we entered my father's room, the smell of urine was often overpowering." On one occasion, they found him sitting in his wheelchair in urine-soaked pants that were in such poor condition they had to be discarded. On another occasion, one of his daughters found him lying in bed covered in feces with feces also on the bed and floor. She said that he was embarrassed and wanted her to leave, but she stayed and cleaned him and his room. She also claimed that Sterling Park never increased his laundry service as promised and he continued to "live surrounded by dirty laundry."

¶15 Sterling Park does not dispute that in October 2002, it failed to provide medication that Warner needed to treat a biopsy site on his head. Warner went four days without the medication. Sterling Park's expert, Dr. Sabine von Preyss-Friedman, stated in her declaration that the failure to apply medication to his biopsy site was a violation of the standard of care, but it resulted in no harm or exacerbation of his condition. She also said that based on her review of Warner's records, there was no evidence of mental or physical abuse or improper care resulting in harm to Warner by Sterling Park employees. But she later testified in her deposition that Morrissey may have suffered some "harm and discomfort" during the time the facility failed to provide the needed medication. She also acknowledged that the head wound may have healed more slowly because of the lack of medication. She said there was no "lasting harm" resulting from the lack of medication.

---

9 RCW 74.34.020(9).

¶16 The trial court ruled that Morrisey's children's statements about Regent's failure to provide basic hygiene necessities were too generic to support the tort of negligence. It also found that failing to provide medication was a breach of the standard of care, but Warner had not come forward with expert testimony establishing harm or proof of damages. Both the facility and the trial court applied common law negligence standards to Warner's VAS claim. This was error because the VAS establishes a separate cause of action with its own standards of proof which are different from common law negligence.[10]

¶17 Sterling Park does not dispute that Morrissey Warner was a vulnerable adult or that it is a "facility" under the VAS that owed Warner a duty of care. Thus, all Warner needed to show to state a claim under the VAS was that Sterling Park or its representatives "neglected" him as that term is defined in the statute. The VAS does not require expert testimony to establish "neglect," "pain and suffering," or resulting damages. In adopting the VAS, the legislature expanded the protections for vulnerable adults in Washington and created a new cause of action.[11]

¶18 Sterling Park argues that the duties owed by an assisted living facility are not common knowledge, and expert testimony is required to assist the trier of fact and establish the standard by which conduct should be measured. But "neglect" is defined in the statute and is the standard by which Sterling Park's conduct is measured. Further, the facility's own policy on abuse and neglect included as examples of neglect "failure to carry out physician orders," "failure to carry out treatment plans," and "being left to sit or lie in urine or feces." Viewed in the light most favorable to Warner, his daughters' statements that they routinely found him wearing wet incontinence pads and one time found him covered in feces, combined with the

---

[10] *See Conrad v. Alderwood Manor*, 119 Wn. App. 275, 78 P.3d 177 (2003) (affirming the jury's separate special verdicts and damage awards for common law negligence and neglect under the VAS).

[11] *Schumacher*, 107 Wn. App. at 801.

failure to provide his biopsy medication, create a genuine issue of material fact about whether the facility "neglected" Warner as that term is defined in the VAS.

¶19 Further, a reasonable fact finder could conclude that Warner experienced pain and suffering from being regularly left to sit in his own urine and feces and from the lack of medication for his biopsy. Even Dr. von Preyss-Friedman testified that he may have endured harm and discomfort during the days he went without the prescribed medication. Assuming the pain and suffering is temporary, that affects only the amount of damages, not their existence. A genuine issue of material fact remains about whether Morrissey Warner endured pain and suffering as a result of neglect under the VAS. We reverse the order granting summary judgment for Sterling Park on Warner's claim of neglect under the VAS and remand for further proceedings.

## II. *Helen Mantooth's Hearsay Statement*

¶20 Mantooth's family argues that the trial court erred by excluding her hearsay statement on the basis of her dementia. They contend it is inherently reliable because it falls under a firmly rooted hearsay exception. Sterling Park argues that Mantooth's statement does not possess the circumstantial guaranties of trustworthiness necessary to qualify as an exception to the hearsay rule. It contends that not only was she inherently unreliable because of her dementia but her statement did not qualify as an excited utterance.[12]

¶21 Normally, an appellate court uses a de novo standard of review when considering a trial court's evidentiary rulings made in conjunction with a summary judgment motion.[13] This is appropriate here, where the trial court never held an evidentiary hearing, but instead based its decision on documentary evidence. When ruling

---

[12] Sterling Park does not dispute that if the trial court erred in excluding Mantooth's statement, it also erred in granting Regent's motion for summary judgment.

[13] *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998); *Seybold v. Neu*, 105 Wn. App. 666, 678, 19 P.3d 1068 (2001) (citing *Folsom*, 135 Wn.2d at 663). *But see Am. States Ins. Co. v. Rancho San Marcos Props., L.L.C.*, 123 Wn.

on a summary judgment motion, a court cannot consider inadmissible evidence.[14]

¶22 Hearsay is generally inadmissible,[15] but there are exceptions for hearsay statements shown to be reliable.[16] Reliability is presumed only where the hearsay statement "contains particularized guaranties of trustworthiness."[17] "Hearsay exceptions necessarily contemplate that the declarant's perception, memory, and credibility will not be explored through the use of cross-examination. Instead, the trial court must find that the circumstances surrounding the making of the statement render the statement inherently trustworthy."[18] Statements falling under " 'firmly rooted' " hearsay exceptions are considered inherently trustworthy.[19] Because "testimonial competence (the ability to understand the difference between the truth and a lie and the obligation to speak truthfully) is not among the factors used to determine reliability,"[20] the reliability analysis is difficult where, as here, the declarant suffers from dementia.

---

App. 205, 214, 97 P.3d 775 (2004) ("We review the trial court's ruling on evidentiary matters before it on summary judgment for abuse of discretion.") (citing *McKee v. Am. Home Prods. Corp.*, 113 Wn.2d 701, 706, 782 P.2d 1045 (1989)), *review denied,* 154 Wn.2d 1008 (2005); *Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co.*, 122 Wn. App. 736, 744, 87 P.3d 774 (2004) (court applied abuse of discretion standard of review to trial court's evidentiary rulings related to a decision on summary judgment), *review denied,* 153 Wn.2d 1016 (2005).

[14] *King County Fire Prot. Dist. No. 16 v. Hous. Auth. of King County*, 123 Wn.2d 819, 826, 872 P.2d 516 (1994).

[15] ER 802; *State v. Chapin*, 118 Wn.2d 681, 685, 826 P.2d 194 (1992).

[16] *Chapin*, 118 Wn.2d at 685.

[17] *State v. Thomas*, 150 Wn.2d 821, 853, 83 P.3d 970 (2004).

[18] *State v. C.J.*, 148 Wn.2d 672, 684, 63 P.3d 765 (2003) (citing *State v. Rice*, 120 Wn.2d 549, 565-66, 844 P.2d 416 (1993)).

[19] *Chapin*, 118 Wn.2d at 685 (quoting *White v. Illinois*, 502 U.S. 346, 356, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992)).

[20] *C.J.*, 148 Wn.2d at 684.

¶23 In *Boyce v. Fernandes*, the Seventh Circuit likened elder abuse to child abuse in that it is difficult to detect and prosecute.[21] Both types of abuse often involve a victim who is an "unreliable witness because of limited mental capacity—undeveloped in the case of the child, impaired by old age in the case of the elder. . . . Accusations by demented persons must always be viewed with a certain skepticism . . . ."[22] Washington has special rules for child hearsay statements,[23] but no such rules govern hearsay statements made by allegedly incapacitated elders.

¶24 The most analogous evaluation of the issue presented here is in *State v. Chapin*.[24] Chapin worked as a nurse's aid at a convalescent center.[25] One of his patients, Orval Hillison, had Alzheimer's disease. One day, Hillison became very agitated every time he saw Chapin. Later that day, Hillison's wife visited him, and when Chapin entered the room, Hillison started shouting and threatening him. Hillison began to cry, and when his wife asked him why he did not like Chapin, Hillison said " 'Raped me'."[26] The State charged Chapin with second degree rape.

¶25 Although Hillison was not competent to testify, the trial court admitted his "Raped me" statement as an excited utterance. The Washington Supreme Court concluded that Hillison did not make his statement while in an excited state caused by a startling event.

---

[21] 77 F.3d 946, 948 (7th Cir. 1996).

[22] *Id.* at 948-49.

[23] *See* RCW 9A.44.120.

[24] 118 Wn.2d 681, 826 P.2d 194 (1992).

[25] *Id.* at 685.

[26] *Id.* at 684.

In sum, Hillison was confused, prone to confabulation, subject to persecutory delusions, hostile to those who tried to direct his behavior, and hostile in particular to male attendants. Hillison made the statement, "Raped me", after calming down from being angry, not from being excited, and in response to a question from his wife. In addition, Hillison's anger was elicited not by any startling event, but by seeing Chapin, which was a normal part of Hillison's life at the Center and which had occurred at least twice previously that day. These factors leave us persuaded that Hillison's statement was not a spontaneous and reliable utterance made while he was under the stress of excitement caused by the occurrence of a startling event. . . .[27]

¶26 It is important to recognize that the *Chapin* court did not preclude admission of Hillison's statement under a hearsay exception because of his mental incapacity. Instead, it treated his incapacity as an additional factor supporting its conclusion that the statement was not an excited utterance. This strikes an appropriate balance between the need to protect vulnerable elders with the need to assure that hearsay statements are reliable and trustworthy. A declarant's mental incapacity does not render his or her hearsay statements per se inadmissible. If, despite the declarant's incapacity, the circumstances surrounding the making of the statement provide a guaranty of trustworthiness, the statement is still admissible.[28]

¶27 Mantooth's family argues that her statement is inherently trustworthy because it was an excited utterance, one of the firmly-rooted hearsay exceptions.[29] They contend that the trial court excluded her statement simply because

[27] *Id.* at 691.

[28] *See C.J.*, 148 Wn.2d at 684.

[29] ER 803(a)(2); *Chapin*, 118 Wn.2d at 685. Mantooth also argues that the statement was made for purposes of medical diagnosis or treatment. *See* ER 803(a)(4). But there is no indication that she made the statement because she was seeking medical care, so this hearsay exception does not apply.

she had dementia and never reached the question whether it was an excited utterance. An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."[30] The rationale underlying this exception is that " 'under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control'."[31] The utterance of a person in this excited condition is considered " 'a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock,' rather than an expression based on reflection or self-interest."[32]

¶28 A hearsay statement must meet three requirements to qualify for this exception: there must be a startling event or condition, the declarant must make the statement while under the stress or excitement of the event or condition, and the statement must relate to the event or condition. Here, the second element is the primary issue, and the key to that element is spontaneity.[33] Although the statement need not be made contemporaneously with or immediately after the event, it must still be spontaneous and made under circumstances which negate the concern that it was made by design or after premeditation.[34] The longer the interval between the underlying event and the statement, "the greater the need for proof that the declarant did not actually engage in reflective thought."[35]

¶29 The trial court clearly considered whether Mantooth's statement qualified as an excited utterance. In its oral ruling, the court said:

---

[30] ER 803(a)(2).

[31] *Chapin,* 118 Wn.2d at 686 (quoting 6 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW, § 1747, at 195 (James H. Chadbourne rev. ed. 1976)).

[32] *Id.* (quoting WIGMORE, *supra,* at 195).

[33] *See Chapin,* 118 Wn.2d at 687-88.

[34] *Burmeister v. State Farm Ins. Co.,* 92 Wn. App. 359, 369, 966 P.2d 921 (1998) (citing *Robbins v. Greene,* 43 Wn.2d 315, 321, 261 P.2d 83 (1953)).

[35] *Chapin,* 118 Wn.2d at 688.

When you're looking at an excited utterance statement, which is one of the bases that plaintiffs is [sic] offering Mrs. Mantooth's statement[,] you have to look at the circumstances under which that statement was made, and you have to look at the time frame in which the statement was made. You can't say it doesn't matter when this incident took place, because anytime you're looking at excited utterance you have to analyze was the person still under the stress and excitement of the event? How close in time to the event is the statement being made? Has the declarant had an opportunity to fabricate or to think about the statement that's being made? You have to find that there is no possibility of some intervening factor or either some event or some influence that would cause the person to make a statement that may be different from the truth. The reliability and the trustworthiness are the crucial core to that statement. . . .

The court specifically questioned the timing of the statement,[36] ultimately concluding that it did not support a ruling that the statement was an excited utterance. Even viewing the evidence in the light most favorable to Mantooth, we agree with the trial court's conclusion.

¶30 There is no dispute that Mantooth made the statement while in an extremely agitated, emotional state and that she had not made accusations of this particular type before. But it is also clear that it was at least two hours after the event when she made the statement.[37] In itself, the two-hour delay is not crucial. But there is also no evidence that she remained in an emotional and agitated state during this intervening period. Given her mental incapacity, she needed to provide at least some evidence that she remained in a state such that she had not engaged

[36] The trial court stated that it could not find anywhere in the pleadings a solid time for the alleged assault, and it asked Mantooth's attorney whether there was a specific time at which "the plaintiffs are saying Mrs. Mantooth was assaulted?"

[37] Mantooth's family asserts the incident occurred before breakfast the same morning she reported it. The records indicate she reported the incident at 11:15 AM, presumably at least two hours after breakfast.

in reflective thought between the event and the statement.[38] Because she could not do so, she did not demonstrate the spontaneity necessary for an excited utterance. The trial court properly excluded her hearsay statement on this ground.

¶31 Mantooth's family is correct that the trial court based its decision to exclude her hearsay statement in part on her dementia and Dr. Capwell's assessment of her ability to accurately perceive events and conditions. As the *Fernandes* and *Chapin* courts noted, when an elderly declarant's mental incapacity affects her ability to perceive, it may raise questions about the reliability and trustworthiness of her statements. This conundrum is reflected in Dr. Capwell's statement that although he could not confirm the accuracy of a report by a person like Mantooth who has moderate dementia, that does not mean the report is untrue.

¶32 It is not possible to delineate a bright-line rule about what role a declarant's mental incapacity should play, or how much weight it should be given, in determining whether her statement is admissible under a hearsay exception. Like the declarant in *Chapin*, Mantooth's mental deterioration raises doubts about whether her statement is true, that is, whether the event actually happened. This is different from and more difficult than the normal evaluation of an excited utterance where there is no serious question that the event did occur. As in *Chapin*, the trial court had to consider evidence that Mantooth had been diagnosed with both dementia and bipolar disorder, and her perception of events was questionable. She had become increasingly combative and had several physical altercations with other residents. In the days immediately preceding the alleged event, she yelled and struck out at a staff member and angrily accused aides of laughing at her and mocking her when there was no reason to think they had done so.

---

[38] *See, e.g., State v. Flett*, 40 Wn. App. 277, 287, 699 P.2d 774 (1985) (victim's statement made seven hours after rape properly admitted as excited utterance because there was "continuing stress experienced and exhibited by the victim" between time of rape and statement).

¶33 We again note that Mantooth's mental incapacity, taken alone, is not enough to disqualify her statement as an excited utterance. But, as in *Chapin,* it is a factor in the "totality of the circumstances" we must consider in assessing the reliability of the statement. Our primary concern is the complete lack of evidence of Mantooth's mental state during the two-plus hour time lapse between her statement and the alleged event. Combined with her severe mental deterioration, this raises substantial doubts about whether her statement was a spontaneous and trustworthy response to a startling event. Further, unlike in *Chapin,* there was no corroborating evicence of an assault. Under these circumstances, her statement simply does not have the guaranties of trustworthiness necessary for admission as an exited utterance.

¶34 The trial court did not err by excluding Mantooth's hearsay statement, so it properly dismissed her assault claim, and we affirm the dismissal. We reverse the trial court's order granting summary judgment for Sterling Park on Morrissey Warner's claim for neglect under the VAS and remand for further proceedings.

BECKER and DWYER, JJ., concur.

Reconsideration denied and opinion amended July 21, 2006.