**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
AUGUST 3, 2023

Gonzáles, C.J.
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
AUGUST 3, 2023

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 100922-4 |
| Respondent, | EN BANC |
| v. | Filed: August 3, 2023 |
| PAUL RIVERS, | |
| Petitioner. | |

STEPHENS, J.—The state and federal constitutions guarantee the right to trial by an impartial jury drawn from a fair cross section of the community. Jury diversity is central to a fair and democratic system of justice, as diverse juries bring broader perspectives that foster rich deliberations and lead to better informed decisions. Paul Rivers, a Black man, was convicted on two criminal charges in King County by a jury drawn from a panel that lacked any Black potential jurors. Rivers argues this venire, as well as certain aspects of the King County jury selection system that produced this venire, violated his state and federal fair cross section rights.

Though Rivers argues his convictions must be reversed under existing United States Supreme Court precedent, he urges that article I, sections 21 and 22 of the Washington Constitution provide greater protection of the fair cross section guaranty

*State v. Rivers*, No. 100922-4

than does the Sixth Amendment to the federal constitution. Rivers, supported by amici,[1] proposes a new test under state law in which a defendant establishes a per se constitutional violation by showing a comparative disparity level of 20 percent or more in a single jury venire.[2] Alternatively, if the court continues to evaluate disparities across all jury venires rather than by considering only the defendant's jury panel, Rivers proposes to eliminate the requirement of showing a systematic cause for the disparity. *See Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979) (violation of Sixth Amendment's fair cross section guaranty requires showing that underrepresentation of a distinctive group "is due to systematic exclusion of the group in the jury-selection process").

No one in this case disputes that jury diversity is lacking in Washington and that more can and must be done to promote juror diversity statewide. This court and others have an administrative responsibility to address the policy question of how to facilitate juror participation and achieve greater jury diversity across Washington. However, the case before us invokes our appellate jurisdiction, not our

---

[1] The Fred T. Korematsu Center for Law and Equality, the American Civil Liberties Union of Washington, the King County Department of Public Defense, and the Public Defender Association filed a joint amici curiae brief in support of Rivers. The Washington Association of Criminal Defense Lawyers also filed an amicus curiae brief in support of Rivers.

[2] Comparative disparity is one of numerous statistical methods, discussed in greater detail *infra*, that courts employ to measure jury representativeness when assessing fair cross section claims.

2

administrative function, and the legal question presented is whether Rivers has established a violation of his fair cross section rights under either the federal or state constitution. Because Rivers has not shown that the Washington Constitution requires the heightened test he proposes for assessing fair cross section claims, we analyze his claim using the existing Sixth Amendment framework, which this court has applied in prior cases. *See Duren*, 439 U.S. at 364; *see also In re Pers. Restraint of Yates*, 177 Wn.2d 1, 20, 296 P.3d 872 (2013). Applying that framework, we conclude that Rivers's venire and King County's jury selection system satisfy constitutional minimums.

Because Rivers is not entitled to a new trial based on his fair cross section claim, we address his additional challenge to the trial court's admission of expert testimony regarding the correlation between strangulation and memory loss as well as the trial court's decision not to answer a written question from the jury regarding the mens rea of assault by suffocation. We affirm on each claim because the trial court acted within its discretion in both instances. We remand for resentencing, however, because Rivers is entitled to the benefit of RCW 9.94A.647, which no longer allows a persistent offender life sentence based on prior second-degree robbery convictions.

*State v. Rivers*, No. 100922-4

BACKGROUND ON KING COUNTY JURY SELECTION AND RACE
DEMOGRAPHICS

As Rivers's principal challenge is to the composition of his jury venire, some background is necessary regarding the jury summons process in King County and, more generally, race demographic data for the county.

*A. Jury Summons Procedures in King County*

Across Washington, courts randomly select prospective jurors from master jury lists. RCW 2.36.010(12). Master jury lists are compiled from jury source lists, which contain names and addresses of registered voters, licensed drivers, and identicard holders who reside in a particular county. RCW 2.36.010(10); *see also* RCW 2.36.054; GR 18(c). The court clerk notifies individuals randomly selected for jury service by issuing a summons. RCW 2.36.095. Low juror response rates are typical in many counties, including King County. *See, e.g.*, PETER A. COLLINS & BROOKE MILLER GIALOPSOS, AN EXPLORATION OF BARRIERS TO RESPONDING TO JURY SUMMONS: TECHNICAL REPORT TO THE WASHINGTON STATE ADMINISTRATIVE OFFICE OF THE COURTS 8-9 (June 24, 2021), https://www.courts.wa.gov/subsite/mjc/docs/2021_Jury_Study_Final_Report.pdf (over a four-month period in 2021, King County reached only a 10 percent response rate to jury summonses). Those who do respond to a jury summons can request excusal on the basis of undue hardship, for example, due to work obligations or a medical condition. *See* RCW 2.36.100(1). Otherwise, summoned jurors generally

complete a questionnaire before appearing in court, which helps the court determine eligibility and fitness to serve. *See, e.g.*, *How a Jury Is Chosen*, SEATTLE MUN. CT. https://www.seattle.gov/courts/jury/reporting-for-jury-duty/how-a-jury-is-chosen. Eligible jurors who appear for service form the venire panel, at which point the attorneys conduct voir dire and select veniremembers to serve on the petit jury and to decide the case. *See, e.g.*, *id.*

B. *Seattle and Kent Jury Assignment Areas*

King County has two full-service superior courthouses: the King County Courthouse in Seattle and the Norm Maleng Regional Justice Center in Kent. *State v. Lanciloti*, 165 Wn.2d 661, 664, 201 P.3d 323 (2009). Until 2007, King County summoned prospective jurors to either courthouse randomly regardless of proximity. *Id.* Superior Court judges began to observe that jurors were more likely to appear for jury service when summoned to the courthouse closest to their home. *Id.* One judge compiled detailed demographic data that tended to show "distance to the courthouse had a disproportionate impact on poor and minority jurors, making juries overall less representative of King County." *Id.*

In response to requests from King County Superior Court judges, the legislature amended the jury summons statutes to permit counties with two or more courthouses to create multiple jury districts within the county. *Id.*; *see also* LAWS OF 2005, ch. 199, *codified as* RCW 2.36.055. The express purpose of this legislative

amendment was to "lessen the burdens borne by jurors fulfilling their civic duties by providing a mechanism that narrows the geographic area from which the jurors are drawn while maintaining a random and proportionate jury pool." LAWS OF 2005, ch. 199, § 1. In 2007, the King County Superior Court promulgated Local General Rule (LGR) 18, which creates separate geographic jury assignment areas for Seattle and Kent. LGR 18 divides the jury source list so that prospective jurors are summoned to the courthouse closest to their residence, based on zip code. LGR 18(1). The "Seattle Case Assignment Area" includes roughly all of the city of Seattle and north of Interstate 90; the "Kent Case Assignment Area" encompasses everything else sprawling south of Seattle. *Lanciloti*, 165 Wn.2d at 665; *see also* Local Civil Rule (LCR) 82(e)(3).

*C. King County's Racially Disparate Neighborhood Demographics*

The United States has a shameful history of segregating neighborhoods through the use of racially restrictive covenants. *See In re That Portion of Lots 1 & 2*, 199 Wn.2d 389, 395-96, 506 P.3d 1230 (2022) (tracing the history of racial covenants across the country). Seattle is no exception.

Seattle's first known racially restrictive covenant was written in 1924. Catherine Silva, *Racial Restrictive Covenants History: Enforcing Neighborhood Segregation in Seattle*, SEATTLE CIV. RTS. & LABOR HIST. PROJECT, https://depts.washington.edu/civilr/covenants_report.htm [https://perma.cc/NY93-

3G34]. Similar covenants quickly proliferated throughout the city, spurred in large part by land developers and real estate companies. *Id.* Many neighborhoods used racially restrictive covenants and deeds to exclude non-White and Jewish families. *Id.* These restrictions "played a major role in dictating municipal demographics" throughout the first half of the twentieth century. *Id.* As a result, Black residents had few housing options and were heavily concentrated in Seattle's Central District and International District. *Id.*

Redlining also contributed to racial segregation in Seattle. "Redlining" is "[c]redit discrimination . . . by an institution that refuses to provide loans or insurance on properties in areas that are considered to be poor financial risks or to the people who live in those areas." BLACK'S LAW DICTIONARY 1531 (11th ed. 2019). Lenders relied on maps drawn to indicate the "best" Seattle area neighborhoods in which banks should invest; banks generally refused to lend money for properties in "declining" and "hazardous" neighborhoods. *See* HOME OWNERS' LOAN CORPORATION SECURITY MAP AND AREA DESCRIPTIONS (January 10, 1936), https://cdm16118.contentdm.oclc.org/digital/collection/p16118coll2/id/379 [https://perma.cc/CTP4-PRL6]; *see also* Bruce Mitchell & Juan Franco, *HOLC "Redlining" Maps: The Persistent Structure of Segregation and Economic Inequality*, NAT'L CMTY. REINVESTMENT COAL. (Mar. 20, 2018), https://ncrc.org/holc/ [https://perma.cc/JWQ7-MZL5].

7

Redlining "essentially divided cities according to their racial demographics in order to determine the economic desirability of certain neighborhoods." Silva, *supra*. A 1976 Seattle task force reported that banks assigned "higher risks to neighborhoods whose residents differ in race," which "penalize[d] neighborhoods because of the diversity of their residents or because of concentrations of racial and ethnic minorities." DRAFT REPORT OF THE MAYOR'S REINVESTMENT TASK FORCE 14 (Jan. 1, 1976), http://archives.seattle.gov/digital-collections/media/collectiveaccess/images/1/9/3/8/3616_ca_object_representations_media_193823_original.pdf [https://perma.cc/MFS8-EJC9]. This practice prevented Black, Indigenous and People of Color (BIPOC) from purchasing homes because they could not obtain mortgages in the only neighborhoods where they were legally permitted to live. Silva, *supra*. As a result, Black residents faced significant barriers to accumulating generational wealth and, over time, they continued to spread south into areas that were historically redlined and underinvested compared to the largely white neighborhoods north of Seattle. James Gregory, *Seattle's Race and Segregation Story in Maps 1920-2020*, SEATTLE CIV. RTS. & LABOR HIST. PROJECT, https://depts.washington.edu/civilr/segregation_maps.htm [https://perma.cc/NXM4-5U6B].

The consequences of this history remain. Racially restrictive covenants and redlining "have had a profound and lingering impact on the Seattle area, reflected

8

*State v. Rivers*, No. 100922-4

even today in the distribution of minorities through the city and its suburbs." Silva, *supra*. Today, the majority of Black residents in King County continue to live "in the Central District and sprawling southward through Rainier Valley and into the southern suburbs." *Id*.; *see also* Gregory, *supra* (mapping the distribution of Black residents in the Seattle area by percentage of population over time).

The Seattle-Kent jury district divide tracks these racial disparities because it separates King County into two distinct northern and southern jury assignment areas. The record in this case contains data indicating that while King County's overall population in 2015 was 5.60 percent Black, the Seattle assignment area population was only 4.14 percent Black while the Kent area's was 8.11 percent Black. In other words, the Kent jury assignment area had nearly twice as many Black residents as the Seattle jury assignment area.

CASE FACTS AND PROCEDURAL HISTORY

*A. Background Facts of Paul Rivers's Case*

Paul Rivers met Summer Power in 2017 and they began a sporadic dating relationship. At approximately 2:00 a.m. on February 11, 2018, Seattle police responded to a 911 call in which the caller reported a female assaulting a male in the street. When officers arrived, both parties admitted to having a verbal argument but denied physical contact. The officers decided to separate the parties; one officer drove Rivers home while another drove Power to the precinct to call her own ride

home.  Both Rivers and Power had been drinking that night.  Power does not recall

this 2:00 a.m. incident, nor the police response, nor being driven to the precinct.

Later that morning around 4:00 a.m., Power went to Rivers's home, and the

two resumed arguing.  The first thing Power remembers from the night is the

altercation that ensued.  Power alleges that when she tried to leave Rivers's house,

Rivers pushed her onto the bed and got on top of her.  He lifted her shirt and

forcefully bit her breast.  Rivers then placed his hand on Power's throat and began

"choking" her.  2 Verbatim Rep. of Proc. (VRP) at 914.  Rivers also covered her

nose and mouth, blocking her breathing.  When Rivers stood up, Power ran out of

the house and attempted to call the police using her cell phone.  Rivers followed and

grabbed Power's phone.  Power ran to a neighbor's house and began screaming for

help while banging on the front door.  A resident called 911.

Officers soon arrived and observed that Power appeared "very flustered,"

"was crying," and "seemed out of breath."  2 VRP at 568.  Power told police Rivers

had choked her.  One officer noticed "her neck was visibly red" and had

"marks . . . where she stated she was choked."  2 VRP at 572, 574-75.  When Rivers

spoke to officers at the scene, he denied choking Power but stated that the two had

been drinking and that Power was his girlfriend.  He admitted to grabbing Power's

phone but claimed he had done so playfully like "a game."  2 VRP at 625-26.  Police

arrested Rivers for domestic violence.  The State charged Rivers with one count of

*State v. Rivers*, No. 100922-4

second degree assault by strangulation and suffocation and one count of interfering with domestic violence reporting.

### B. *Pretrial Motion for a Jury Venire Drawn from a Fair Cross Section*

Before trial, Rivers filed a motion seeking a jury venire drawn from a fair cross section of the community, raising arguments under both the federal and state constitutions. In support of his motion, Rivers provided statistical data from a report by University of Washington Professor Katherine Beckett titled "The Under-Representation of Blacks in the King County Jury Pool." Clerk's Papers (CP) at 106. Beckett's report analyzes demographic data collected from jurors summoned in King County over a period of 20 consecutive court days in 2015. From this data, Beckett found a general trend of underrepresentation of Black jurors in King County. For example, although the county's overall population was 5.60 percent Black, only 3.61 percent of King County jurors were Black. Black jurors were also underrepresented in the individual jury pools of both Kent (5.33 percent) and Seattle (2.29 percent) when compared to the overall Black population of King County.

Rivers argued in his motion that the underrepresentation of Black jurors in Seattle was the result of systematic exclusion because King County's summons procedures combined with low juror response rates produce an "oversampling" of predominantly white zip codes and an "undersampling" of more racially diverse zip codes. He further argued that King County's choice to divide itself into two separate

11

*State v. Rivers*, No. 100922-4

jury districts along racially disparate demographic lines amounted to systematic exclusion of Black residents from Seattle juries. The trial court denied Rivers's motion, ruling he failed to demonstrate systematic exclusion as required by *Duren.* The court declined to consider Rivers's arguments under the Washington Constitution. The court later noted for the record that Rivers's particular jury panel had no potential jurors who appeared to be Black, though "it's always hard to tell with appearances." 1 VRP at 275-76.

### C. *Facts Relating to Rivers's Evidentiary Challenge to the Admission of Expert Witness Testimony*

At trial, Power testified for the State. She admitted to having no memory of most events from the evening in question but described her experience being pushed onto the bed, bitten, choked, and smothered. The State offered expert testimony from Theresa Stewart, a sexual assault nurse examiner (SANE). Rivers objected to Stewart's testimony regarding the connection between strangulation and memory loss, arguing she was not an expert on the subject. The court conducted voir dire on Stewart's qualifications outside the presence of the jury. Stewart had worked at Harborview Medical Center for 17 years treating sexual assault and domestic violence patients, including those who suffered strangulation. She participated in and conducted trainings on the topic of sexual assault strangulation. Stewart had previously been qualified as an expert and testified in court on the topic of strangulation approximately 20 times.

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Rivers*, No. 100922-4

Based on her professional experience and training, the court permitted Stewart's expert testimony. Stewart described to the jury signs and symptoms of strangulation. She also testified in general terms regarding the correlation between strangulation and memory loss. 2 VRP at 778-79 ("As part of our sexual assault training and part of the work that we do, we learn and [are] trained around . . . what happens to people who experience trauma, which would include both sexual assault, strangulation, domestic violence. . . . [I]n a traumatic event, people have difficulty recording the memories . . . there may be things that they don't remember, and they definitely—certainly in my experience with sexual assault patients, really struggle to give a history that is a nice clean linear history that goes from A to Z.").

*D. Facts Relating to the Trial Court's Response to the Jury's Question*

During jury deliberations, the jury sent out a question about the criminal intent required if someone were killed by suffocation: "Regarding instruction 14: If someone accidentally killed someone by impairing their ability to breathe without the intent of obstructing airflow, would the defend[a]nt be found guilty of suffocation?" CP at 62. Instruction 14 defined "suffocation": "'Suffocation' means to block or impair a person's intake of air at the nose and mouth, whether by smothering or other means, with the intent to obstruct the person's ability to breathe." CP at 50. The court was concerned about the hypothetical nature of the jury's question, given that no homicide charge was at issue, and it invited proposed

13

responses from both sides. The prosecution preferred to refer the jury to the instructions already given. The defense proposed two possible responses: tell the jury a person who blocks another's air intake without intending to obstruct the person's ability to breathe does not commit suffocation or, alternatively, that suffocation requires the intent to obstruct another's ability to breathe.

The court decided not to give the jury further instructions in response to the hypothetical question and told the jury to refer to the instructions already given. The given instructions included a standard pattern instruction defining "intent": "A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime." CP at 48; 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.01 (5th ed. 2021). It is undisputed that the jury instructions concerning the mens rea for assault reflected an accurate statement of the law, requiring the jury to find the defendant acted with intent.

### E. Facts Relating to Rivers's Sentencing and Appeal

The jury convicted Rivers on both charges. At sentencing, the trial court found Rivers to be a persistent offender based on his convictions for three "most serious offense[s]," including two prior convictions for second degree robbery. CP at 194, 200. The Court sentenced Rivers to life imprisonment without parole on count one based on the persistent offender statute, RCW 9.94A.570, and to a

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Rivers*, No. 100922-4

concurrent sentence of 364 days' confinement and 36 months' community custody on count two.

Rivers appealed, raising numerous challenges, including violation of his constitutional right to an impartial jury panel drawn from a fair cross section of the community. Following oral argument on March 2, 2022, the Court of Appeals determined pursuant to RCW 2.06.030 that this case presents a fundamental and urgent issue of broad public import requiring prompt and ultimate determination:

> Whether article I, section 21 and/or section 22 of the Washington State Constitution provide greater protection of the right to a jury venire drawn from a fair cross section of the community than the Sixth Amendment to the United States Constitution.

Ord. of Certification, *State v. Rivers*, No. 81216-5-I, at 1 (Wash. Ct. App. May 11, 2022). The Court of Appeals accordingly certified this case to our court, and we accepted the transfer of the appeal for determination on the merits.

ANALYSIS

We first address Rivers's fair cross section claim before turning to his remaining challenges to his conviction and sentence. Constitutional issues are questions of law we review de novo. *State v. Jorgenson*, 179 Wn.2d 145, 150, 312 P.3d 960 (2013) (citing *State v. Sieyes*, 168 Wn.2d 276, 281, 225 P.3d 995 (2010)). We generally review a trial court's decisions admitting testimony and determining how to respond to a deliberating jury's questions for abuse of discretion. *State v. Thomas*, 150 Wn.2d 821, 856, 83 P.3d 970 (2004) (admission of testimony); *State*

15

*State v. Rivers*, No. 100922-4

*v. Sublett*, 176 Wn.2d 58, 82, 292 P.3d 715 (2012) (plurality opinion) (questions from deliberating jury).

Rivers has not shown a violation of his fair cross section rights under either the state or federal constitution. We decline to adopt his proposed tests under article I, sections 21 and 22 of the Washington State Constitution. While Rivers and Amici identify serious ongoing concerns about jury diversity in King County and statewide, Rivers fails to demonstrate how his proposed tests are constitutionally required to address these concerns. We adhere to the test set forth by the United States Supreme Court in *Duren*, which this court has long applied. Because Rivers has not shown a constitutional violation under the analysis established in *Duren*, we decline to order a new trial on this basis.

We also decline to order a new trial based on the trial court's decision to admit expert testimony from a sexual assault nurse and its decision not to further instruct the jury in response to its question during deliberations. In both instances, the abuse of discretion standard applies and the trial court reasonably exercised its discretion. We therefore affirm Rivers's convictions, though he is entitled to resentencing because his life sentence as a persistent offender is no longer authorized by RCW 9.94A.570.

16

*State v. Rivers*, No. 100922-4

    I.    <u>Rivers Does Not Establish a Violation of His Right to an Impartial Jury</u>

A criminal defendant is entitled to a trial by an impartial jury, and this constitutional right includes the right to have jury panels drawn from a fair cross section of the community. *Duren*, 439 U.S. at 358-59 (citing *Taylor v. Louisiana*, 419 U.S. 522, 526-31, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975)); *State v. Hilliard*, 89 Wn.2d 430, 440, 573 P.2d 22 (1977) (citing *Taylor*, 419 U.S. at 528). Rivers argues he was deprived of his fair cross section right under both the federal and state constitutions when King County's jury selection system produced his venire containing no apparent Black potential jurors. To prove a fair cross section violation under the Sixth Amendment, the *Duren* test requires a defendant to show (1) a distinctive group (2) is unreasonably underrepresented in his own venire and in jury venires generally, (3) as a result of systematic exclusion in the jury selection process. *Duren*, 439 U.S. at 364, 366. Washington has consistently applied this test in past cases considering claims of underrepresentation on juries. *See, e.g.*, *Yates*, 177 Wn.2d at 18-23; *State v. Cienfuegos*, 144 Wn.2d 222, 230-32, 25 P.3d 1011 (2001); *State v. Rupe*, 108 Wn.2d 734, 746-48, 743 P.2d 210 (1987).

In Rivers's view, the *Duren* test has failed to adequately guard the fair cross section right. He urges us to interpret our state constitution to require a more stringent test for assessing fair cross section claims. Rivers, supported by Amici, proposes we eliminate *Duren*'s requirement of showing underrepresentation

17

generally so that a constitutional violation occurs when a person shows underrepresentation in the particular venire panel at 20 percent or greater comparative disparity. Alternatively, he urges that we eliminate the systematic exclusion requirement so that defendants must only show underrepresentation of a distinctive group.[3] For the reasons below, we find insufficient justification to announce a new test and instead analyze Rivers's fair cross section claim using the existing *Duren* framework. Applying that framework here, we conclude that Rivers has not demonstrated a constitutional violation because the evidence does not establish systematic exclusion.

A. *Background on the Fair Cross Section Right*

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, grants all criminal defendants the right to trial "by an impartial jury." U.S. CONST. amend. VI. In *Taylor*, the United States Supreme Court recognized that "a jury drawn from a venire constituting a fair cross section of the community" is an "essential" component of the Sixth Amendment's

---

[3] The Washington Association of Criminal Defense Lawyers offers yet another alternative, interim test: "Given that the *Duren* standard has been so ineffectual in promoting diverse jury venires, this Court may be concerned that adopting Mr. Rivers' proposed test will create short-term disruptions to the court system. To the extent the Court views such concerns are valid, this Court should not simply leave *Duren* in place, but instead adopt an alternative, interim rule: if underrepresentation in jury venire exceeds 20% comparative disparity, it is presumptively unconstitutional unless the state shows that all reasonable steps have been taken to overcome the history of systematic exclusion." Amended Amicus Curiae Br. of Crim. Def. Laws. of Wash. at 12-13 (emphasis omitted).

*State v. Rivers*, No. 100922-4

impartial jury guaranty. 419 U.S. at 526. The fair cross section right is a means of effectuating the constitutional right to an impartial jury, and it must be understood in this context. *Id*. at 525-26; *Holland v. Illinois*, 493 U.S. 474, 480, 110 S. Ct. 803, 107 L. Ed. 2d 905 (1990) ("The Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not a *representative* jury (which the Constitution does not demand), but an *impartial* one (which it does).").

Shortly after deciding *Taylor*, in *Duren,* the United States Supreme Court announced a three-part test for assessing fair cross section claims. Under *Duren*, a claimant must show

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. at 364. Once a claimant makes a prima facie showing of a fair cross section violation by satisfying each of *Duren*'s three requirements, the burden shifts to the State to "justify[] this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest." *Id.* at 368-69 (State failed to meet this burden because "the preclusive domestic responsibilities of some women is insufficient justification for their disproportionate exclusion on jury venires").

Most litigation centers on *Duren*'s second and third requirements. Regarding the second requirement to date, neither this court nor the United States Supreme

19

*State v. Rivers*, No. 100922-4

Court has endorsed a particular method of measuring underrepresentation. *See Berghuis v. Smith*, 559 U.S. 314, 329-30, 130 S. Ct. 1382, 176 L. Ed. 2d 249 (2010) (finding "no cause to take sides . . . on the method or methods by which underrepresentation is appropriately measured"). Courts are free to use whatever they believe is the best model. The two most popular methods of measuring underrepresentation are absolute disparity and comparative disparity. Absolute disparity is determined by subtracting the percentage of a distinctive group in the jury pool from the percentage of that group in the overall jury eligible population. *Smith*, 559 U.S. at 323. For example, if "Group X" comprises 10 percent of the population but only 4 percent of the jury pool, there is an absolute disparity of 6 percent.

Comparative disparity expresses the absolute disparity as a percentage of the group's overall representation in the community. It purports to state "the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Ramseur v. Beyer*, 983 F.2d 1215, 1231-32 (3d Cir. 1992). Comparative disparity is measured by dividing the absolute disparity figure by the percentage of a distinctive group in the overall jury eligible population. For example, if Group X comprises 10 percent of the population but only 4 percent of the jury pool, there is a comparative disparity of 60 percent.

20

*State v. Rivers*, No. 100922-4

This signifies that 60 percent of the jurors from Group X are missing from the average venire.

Neither statistical method is perfect.  Both have been criticized as poor indicators of underrepresentation when the distinctive group comprises a relatively small percentage of the overall population.  *See, e.g.*, *Smith*, 559 U.S. at 329 (both methods "can be misleading when, as here, 'members of the distinctive group comp[ose] [only] a small percentage of those eligible for jury service'" (alterations in original) (quoting *People v. Smith*, 463 Mich. 199, 203-04, 615 N.W.2d 1 (2000))).  Absolute disparity tends to "understate[] the systematic representative deficiencies" of small groups.  *United States v. Rogers*, 73 F.3d 774, 776-77 (8th Cir. 1996).  For example,

> if we assume a group makes up 90% of the population, but 80% of the jury pool, there would be a 10% absolute disparity.  Under those circumstances, it is doubtful that any court would consider the group underrepresented.  However, if a population group constituted 10% of the population, but had no representation in a jury pool, that result might give rise to fair cross-section concerns.  Yet, the absolute disparity—10%—would be identical under both scenarios.

*United States v. Hernandez-Estrada*, 749 F.3d 1154, 1162 (9th Cir. 2014).  In contrast, comparative disparity tends to "overstate the underrepresentation of a group that has a small population percentage."  *Id.* at 1163.  For example,

> [l]et's assume . . . that a group constitutes .1% of the population, with no representation in the jury pool.  The comparative disparity of that group would be 100%.  Few would argue that the absence of a group representing just 0.1% of the population violates the fair cross-section

21

requirement, yet comparative disparity analysis would suggest otherwise.

*Id.* To account for these problems, courts tend to use a combination of both methods, sometimes in combination with other statistical methods. *See, e.g.*, *id.* at 1162-64 (discussing standard deviation, the absolute impact test, and the disparity-of-risk test); *United States v. Orange*, 447 F.3d 792, 799 (10th Cir. 2006) (using combination of absolute and comparative disparity); *Mosley v. Dretke*, 370 F.3d 467, 479 n.5 (5th Cir. 2004) (using absolute disparity as primary method and permitting comparative disparity in some instances); *Ramseur*, 983 F.2d at 1231 (using combination of absolute disparity, comparative disparity, and deviation from expected random selection).

Next, *Duren*'s third component requires the claimant to show the impermissible underrepresentation is caused by systematic exclusion. This requirement implements *Taylor*'s and *Duren*'s fundamental premise: that a process that systematically excludes distinctive groups from the jury pool is constitutionally intolerable because it deprives the defendant of an impartial jury. *Taylor*, 419 U.S. at 538 ("Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." (citations omitted)).

*State v. Rivers*, No. 100922-4

"Systematic" means "inherent in the particular jury-selection process utilized." *Duren*, 439 U.S. at 366. For example, in *Taylor*, the United States Supreme Court invalidated a Louisiana statute that required women to file a written declaration stating their interest in serving on a jury before becoming eligible for jury service. In effect, the statute systematically excluded the vast majority of women from jury service. *Taylor*, 419 U.S. at 531. Although women comprised 53 percent of the population in the defendant's judicial district, women comprised no more than 10 percent of eligible jurors. *Id.* at 524. This was constitutionally intolerable because the jury was not "drawn from a source fairly representative of the community." *Id.* at 538. The case *United States v. Osorio* provides another example. 801 F. Supp. 966 (D. Conn. 1992). There, two errors—one computer and one unexplained—in the Hartford Division of the District of Connecticut's jury selection system mistakenly excluded from the master jury wheel all residents of both Hartford and New Britain, which were home to a large concentration of Black and Hispanic residents. *United States v. Jackman*, 46 F.3d 1240, 1242-43 (2d Cir. 1995) (citing *Osorio*, 801 F. Supp. at 969-71). As a result, "the exclusion of approximately two-thirds of [B]lacks and Hispanics in the Division as a source of names for jury selection constitute[d] 'systematic exclusion' of those groups from the jury-selection process." *Osorio*, 801 F. Supp. at 979.

*State v. Rivers*, No. 100922-4

Importantly, *systematic* exclusion is not the same as *systemic* exclusion. *See* Paula Hannaford-Agor, *Systematic Negligence in Jury Operations: Why the Definition of Systematic Exclusion in Fair Cross Section Claims Must Be Expanded*, 59 DRAKE L. REV. 761, 769-79 (2011) (explaining the difference between "systematic" and "nonsystematic" factors, which generally include "factors not inherent in the jury selection process itself, but rather 'private sector' influences beyond the control of the court"). Whereas "systemic" exclusion broadly encompasses all forms of institutional racism that collectively produce underrepresentation in juries, "systematic" exclusion is much narrower. It requires the claimant to identify a specific jury selection practice that causes persistent and constitutionally significant exclusion of a particular group from the jury pool. In *Taylor*, for example, the "systematic" apparatus causing unconstitutional disparity was the Louisiana statute that operated to exclude most women from jury service. In *Osorio*, it was two errors that mistakenly excluded all residents of Hartford and New Britain from the jury pool, which in turn excluded significant numbers of Black and Hispanic potential jurors.

While systemic and systematic mean different things, we note that it remains an open question whether systemic factors can nonetheless inform the systematic exclusion analysis; the United States Supreme Court has expressly declined to address the issue. *Smith*, 559 U.S. at 333 n.6 ("We have also never 'clearly' decided,

24

*State v. Rivers*, No. 100922-4

and have no need to consider here, whether the impact of social and economic factors can support a fair-cross-section claim."). At the same time, however, *Duren* requires a defendant to identify something more discrete about the jury selection system itself that produces persistent and traceable exclusion, beyond the myriad of systemic factors that likely combine to produce exclusion. *See id.* at 332 (defendant could not establish prima facie case under *Duren* by "pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation"). And the defendant must tie the disparity to a particular practice with evidence; statistically significant disparities alone are not enough. *See id.* at 330-31.

With this background, we now turn to Rivers's fair cross section claim under the Washington Constitution.

### B. *We Decline To Adopt Rivers's Proposed Tests for Assessing Fair Cross Section Claims under the Washington Constitution*

As noted, Rivers and amici urge us to interpret article I, sections 21 and 22 independently from the Sixth Amendment and to adopt a separate state constitutional analysis to assess fair cross section claims. This court has a duty, where feasible, to resolve constitutional questions first under our own state constitution before relying on federal law. *In re Pers. Restraint of Williams*, 198 Wn.2d 342, 353, 496 P.3d 289 (2021).

Article I, section 21 provides, in relevant part, "[t]he right of trial by jury shall remain inviolate." WASH. CONST. art. I, § 21. Article I, section 22 guarantees the

25

*State v. Rivers*, No. 100922-4

right to trial "by an impartial jury" in all criminal prosecutions. WASH. CONST. art. I, § 22. We have previously considered whether article I, section 21 supports heightened protections in related contexts. *See, e.g.*, *City of Pasco v. Mace*, 98 Wn.2d 87, 99, 653 P.2d 618 (1982) (article I, section 21 guarantees the right to trial by jury for petty offenses, even though the Sixth Amendment guarantees no such right); *State v. Hicks*, 163 Wn.2d 477, 492, 181 P.3d 831 (2008) (relying on "increased protection of jury trials under the Washington Constitution" to uphold finding of prima facie case of discrimination under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)); *State v. Saintcalle*, 178 Wn.2d 34, 49, 309 P.3d 326 (2013) (plurality opinion) ("We should also recognize that there is constitutional value in having diverse juries . . . . Article I, section 21 of our state constitution declares, 'The right of trial by jury shall remain inviolate.'"). We have at least once interpreted section 22's impartial jury guaranty coextensively with the Sixth Amendment. *See State v. Brown*, 132 Wn.2d 529, 598, 940 P.2d 546 (1997) (in the context of death qualification procedures, Washington Constitution does not afford broader protection of the right to an impartial jury than recognized under the Sixth Amendment).

Not all claims encompassed within a particular constitutional provision are the same, so our analysis centers on Rivers's specific claim: that article I, sections 21 and 22 require a more stringent assessment of fair cross section claims than the

26

*State v. Rivers*, No. 100922-4

Sixth Amendment's *Duren* test. "'Even where it is already established that the Washington Constitution may provide enhanced protections on a general topic, parties are still required to explain why enhanced protections are appropriate in specific applications.'" *Williams*, 198 Wn.2d at 354 (quoting *State v. Ramos*, 187 Wn.2d 420, 454, 387 P.3d 650 (2017)). To determine whether our state constitution extends broader rights than the federal constitution in a particular context, we examine the constitutional guaranties in light of the six criteria outlined in *State v. Gunwall*.[4] Claimants who propose an alternative, more stringent test to analyze state constitutional rights independently from their federal counterparts must explain how the Washington Constitution commands the proposed test. *See, e.g., State v. Gocken*, 127 Wn.2d 95, 101-07, 896 P.2d 1267 (1995) (adhering to the "same elements" test in *Blockburger*[5] to assess double jeopardy claims and holding the *Gunwall* factors did not support the proposed "same conduct" test in *Grady*[6]).

---

[4] 106 Wn.2d 54, 720 P.2d 808 (1986). These factors are (1) the state constitutional text, (2) significant differences between the state's text and the text of any parallel provisions of the federal constitution, (3) state constitutional and common law history, (4) preexisting state law, (5) structural differences in state and federal constitutions, and (6) whether the subject matter is of particular state interest or local concern. *Id.* at 61-62.

[5] *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

[6] *Grady v. Corbin*, 495 U.S. 508, 110 S. Ct. 2084, 109 L. Ed. 2d 548 (1990), *overruled by United States v. Dixon*, 509 U.S. 688, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993) (plurality opinion).

27

*State v. Rivers*, No. 100922-4

We find insufficient grounds to adopt Rivers's proposed tests under article I, sections 21 and 22 because he fails to explain how these tests are rooted in our state constitution.  Rivers principally argues that recognition of an "inviolate" jury trial right in article I, section 21 necessarily shows that the Washington Constitution demands a more stringent test for assessing fair cross-section claims because the "federal constitution contains no words sanctifying the jury right to such a degree." Br. of Appellant at 23.  Rivers is correct that section 21 has no federal analog, and that "'inviolate' connotes deserving of the highest protection." *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 656, 771 P.2d 711 (1989).  But we fail to see how the term "inviolate" commands that we find a per se constitutional violation every time a Washington defendant demonstrates a 20 percent or greater comparative disparity in the jury venire.  We similarly fail to see how the term "inviolate" obviates the requirement that defendants show systematic exclusion of a distinctive group.

Beyond the *Gunwall* factors, Rivers urges an independent state constitutional analysis on the ground that the *Duren* test fails to adequately protect the fair cross section right.  Rivers compares *Duren* to *Batson*, noting how our "observation that 'Washington appellate courts have *never* reversed a conviction' under *Batson* spurred [this court] to adopt a new standard for peremptory challenges." Supp. Br. of Pet'r at 11 (quoting *Saintcalle*, 178 Wn.2d at 45-46).  Out of the 20 cases that Rivers cites in which Washington appellate courts assessed fair cross section

28

*State v. Rivers*, No. 100922-4

challenges, he is correct that not one resulted in a reversal on fair cross section grounds. But Rivers's analogy to *Batson* does not help his argument concerning how to interpret the Washington Constitution. In seeking to better address racial bias during jury selection, we never modified *Batson* on state constitutional grounds. Rather, we enacted GR 37 under our rule-making authority through legitimate rule-making procedures. And in *Jefferson*, we modified *Batson* using not our state constitution but our "authority under federal law to create new procedures within existing Fourteenth Amendment frameworks." *State v. Jefferson*, 192 Wn.2d 225, 242, 429 P.3d 467 (2018) (plurality opinion). Our *Batson* jurisprudence therefore does not support modifying *Duren* in the manner that Rivers proposes.

This is not to say that Rivers's concerns about jury diversity in King County and across Washington are unfounded or trivial. Rivers identifies a number of systemic barriers that contribute to persistent and troubling underrepresentation in Washington jury pools and petit juries. These include, among other things, low juror pay, work obligations, lack of family care, and lack of transportation. *See* COLLINS & GIALOPSOS, *supra*, at 31-33. We know these socioeconomic barriers to jury service disproportionately impact BIPOC communities and operate to produce less diverse and more homogenous juries. *See* JURY DIVERSITY TASK FORCE, MINORITY & JUST. COMM'N, 2019 INTERIM REPORT 2-3 (2019), https://www.courts.wa.gov/subsite/mjc/docs/Jury%20Diversity%20Task%20Force

*State v. Rivers*, No. 100922-4

%20Interim%20Report.pdf ("lower income and minority populations are disproportionally affected by the financial hardships of jury service" and "are disproportionately likely to seek economic hardship excusals"). And we know that structural racism contributes to juror underrepresentation in other ways, too. For example, BIPOC people are incarcerated at disproportionately high rates and for longer periods of time than non-BIPOC people. RSCH. WORKING GRP., TASK FORCE 2.0, RACE AND WASHINGTON'S CRIMINAL JUSTICE SYSTEM: 2021 REPORT TO THE WASHINGTON SUPREME COURT 17-21 (2021), https://digitalcommons.law.seattleu.edu/cgi/viewcontent.cgi?article=1116&context =korematsu_center. This translates to a disproportionately small population of jury-eligible BIPOC individuals from which to summon potential jurors.

A lack of jury diversity results from many systemic contributors and, as a result, any effective approach to the problem requires multifaceted solutions. Adversarial litigation and appellate review certainly provide one avenue to effect change, but within limitations. Our role here, sitting as a court in review, is not to decide the best method for optimizing jury diversity or juror participation generally. These policy questions are best answered through legislative action or the judiciary's formal rule-making process, as with GR 37 in the *Batson* context.

Still, we emphasize the critical importance of jury diversity and the urgent need to promote juror participation and representation statewide. It is beyond

30

*State v. Rivers*, No. 100922-4

dispute that "[f]ully representational jury pools and fairly selected juries are required . . . to make our trials fair, our judgments legitimate, and our democracy inclusive." *Rocha v. King County*, 195 Wn.2d 412, 438, 460 P.3d 624 (2020) (González, J., dissenting). Indeed, research shows that diverse juries spend more time deliberating, engage in more thorough and detailed deliberations, are more willing to discuss racial bias, and make fewer factual errors. Samuel R. Sommers, *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations*, 90 J. PERSONALITY & SOC. PSYCH. 597, 606-08 (2006) [https://perma.cc/29WP-SL7U]. Conversely, "[w]hen any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." *Peters v. Kiff*, 407 U.S. 493, 503, 92 S. Ct. 2163, 33 L. Ed. 2d 83 (1972) (Marshall, J.) (plurality opinion). Our holding today does not foreclose the judiciary or the legislature from taking new and different steps toward eradicating systemic barriers to jury service in order to maximize jury diversity in Washington. We acknowledge the legislature's efforts

31

*State v. Rivers*, No. 100922-4

on this front to date,[7] but we recognize that more can and must be done. [8]  *See, e.g.,* JURY DIVERSITY TASK FORCE, *supra*, at 3-7 (making formal recommendations for improving jury diversity in Washington).

---

[7] Most recently, the 2023 legislature enacted Second Substitute Senate Bill (SSSB) 5128, which addresses juror participation and representation in several ways.  Notably, SSSB 5128 directs the administrative office of the courts to "provide all courts with a method to collect data on a juror's race, ethnicity, age, sex, employment status, educational attainment, and income, as well as any other data approved by order of the chief justice of the Washington state supreme court."  LAWS OF 2023, ch. 316, § 1.  SSSB 5128 also permits courts to issue juror summons electronically by e-mail and directs the administrative office of the courts to "establish a work group to make recommendations for the creation of a child care assistance program for individuals reporting for jury service."  LAWS OF 2023, ch. 316, §§ 2-4.

[8] One available solution, which we have previously discussed in detail, is higher juror pay. *See Rocha*, 195 Wn.2d at 431 (concluding jurors are not employees entitled to minimum wage under the Minimum Wage Act or otherwise but noting that "low juror reimbursement is a serious issue that has contributed to poor juror summons response rates"); *see also id.* at 433 (Yu, J., concurring in part and dissenting in part) ("All too often inadequate juror compensation is a barrier to jury service that disproportionately impacts low income and minority populations. I would hold that the system *is* exclusory, but the remedy for this exclusion lies with the legislature, not with the courts." (emphasis added)); *id.* at 440 (González, J., dissenting) (concluding the court should imply a cause of action for higher juror pay because King County's "low pay and low reimbursement rate amounts to an exclusion on the basis of economic status, denying such jurors the opportunity to serve as promised in RCW 2.36.080(1)").  RCW 2.36.150 directs Washington counties to compensate jurors through expense payments ranging between $10 and $25 per day of service, plus mileage reimbursement.  King County, like many other counties, has chosen to pay jurors the statutory minimum of just $10 per day.  *Rocha*, 195 Wn.2d at 417.  King County's present $10 daily rate is no different than it was in 1959—over 60 years ago. *See* LAWS OF 1959, ch. 73, § 1.  This token $10 rate plus a modest travel reimbursement does not meaningfully compensate jurors for a day of missed work in 2023 and beyond. Such low juror pay imposes a significant financial barrier that keeps many low-income and BIPOC citizens out of King County jury pools.  Accordingly, the Minority and Justice Commission Jury Diversity Task Force has offered policy recommendations to increase juror pay statewide and to explore the feasibility of tax credits or deductions for jury service.  *See* JURY DIVERSITY TASK FORCE, *supra*, at 4.

*C. Rivers Does Not Establish a Fair Cross Section Violation under* Duren

Turning to the merits of Rivers's fair cross section claim, we adhere to our precedent and apply the three-part test set forth in *Duren*. Rivers bears the burden of proving that his jury selection system is unconstitutional and warrants a new trial. *Hilliard*, 89 Wn.2d at 440. Under the *Duren* test, he must show (1) a distinctive group (2) is unreasonably underrepresented on venires generally and on his own venire, and (3) this underrepresentation is the result of systematic exclusion. *Duren*, 439 U.S. at 364, 366. When a defendant makes a prima facie showing of a fair cross section violation under *Duren*, the burden shifts to the State to justify the infringement by demonstrating that attainment of a fair cross section is incompatible with a significant state interest. *Id.* at 367-68.

Rivers easily meets *Duren*'s first element. Black people form a distinctive group for *Duren* purposes. *Yates*, 177 Wn.2d at 20. This case, like most, turns on *Duren*'s second and third elements: underrepresentation and systematic exclusion.

With respect to *Duren*'s second requirement, we take this opportunity to clarify that Washington courts are not confined to any one statistical method of measuring underrepresentation. We decline to adopt any particular methodology as constitutionally mandated and instead endorse a flexible approach because different factual scenarios will require different statistical methods. We hold that Washington courts may use one or more statistical models, including but not limited to absolute

*State v. Rivers*, No. 100922-4

and comparative disparity, as the circumstances may warrant. Washington courts

must also consider statistics in light of the real people they purportedly represent.

For example, the Ninth Circuit embraces both absolute and comparative disparity

measures while requiring a showing of

> not only *statistical* significance, but also *legal* significance. The results
> of any statistical method must be examined in the context of the likely,
> actual, "real life" impact on the jury pool at issue. As we have observed
> in earlier cases, "we look to people not percentages."

*Hernandez-Estrada*, 749 F.3d at 1165 (quoting *United States v. Kleifgen*, 557 F.2d

1293, 1297 (9th Cir. 1977)). If a statistical analysis shows underrepresentation, but

the disparity "does not substantially affect the representation of the group in the

actual jury pool, then the underrepresentation does not have legal significance in the

fair cross-section context." *Id.* This approach strikes the appropriate balance and

we adopt it here, recognizing that statistics can be helpful but only when understood

in light of the actual people and groups they measure.

However, we do not reach the question of underrepresentation in this case

because Rivers does not meet *Duren*'s third element, systematic exclusion.

Systematic exclusion means underrepresentation of the distinctive group is "inherent

in the particular jury-selection process utilized." *Duren*, 439 U.S. at 366. Rivers

offers two theories of systematic exclusion. First, he argues that low juror response

rates combined with King County's summons practices produce an "oversampling"

of predominantly white zip codes and an "undersampling" of more diverse zip codes.

34

*State v. Rivers*, No. 100922-4

Framing exclusion in this way does not satisfy *Duren*, as low juror response rates may be due to systemic or other nonsystematic factors external to the county's summons procedures.

Rivers next claims that King County's summons procedures are exclusionary because the county chose to divide itself into two demographically disparate jury districts: Seattle and Kent. He argues the Seattle-Kent divide constitutes systematic exclusion because, as a result of historically racist housing policies, King County's Black population is more heavily concentrated in the Kent jury assignment area. This means fewer Black residents are summoned for jury service in the Seattle jury assignment area and, consequently, Seattle juries are less diverse than Kent juries. The State responds that the Seattle-Kent divide was created in an effort to *promote* jury participation and diversity by eliminating long travel distances. As noted, the legislature enacted RCW 2.36.055 in response to evidence showing that "distance to the courthouse had a disproportionate impact on poor and minority jurors, making juries overall less representative of King County." *Lanciloti*, 165 Wn.2d at 664.

Rivers's argument about the geographic subdivision of King County could establish a form of systematic exclusion under *Duren*, but he has failed to prove this argument with evidence. Although racial demographics combined with jury districting "*might* contribute to a group's underrepresentation," there must be proof of causation. *See Smith*, 559 U.S. at 330-32 (a Kent County, Michigan jury

35

assignment order allegedly "siphoned" Black jurors from the racially diverse city of Grand Rapids to district courts located in less diverse regions of the county and, in theory, systematically excluded such jurors from service in Grand Rapids, but defendant failed to prove this theory with evidence). Professor Beckett's data shows that during a 20-day period, the prospective Kent jury pool was 5.33 percent Black while Seattle's was 2.29 percent Black.[9] CP at 74, 115. However, this data does not reveal "'how the alleged siphoning of [Black] jurors . . . affected the . . . jury pool.'" *Smith*, 559 U.S. at 325 (quoting *Smith*, 463 Mich. at 205). In particular, Rivers does not offer data predating the geographic divide to establish a baseline for assessing how separate jury districts have impacted jury diversity in King County. It is possible that eliminating long travel distances by summoning jurors to their nearest courthouse actually increased BIPOC participation and representation in the jury

---

[9] We note that Professor Beckett's data does not provide a complete picture of juror demographics in King County given that she performed this study over a 20-day period in 2015, reached only a 73.6 percent response rate, and did not record the race of those who declined to take the survey. We also acknowledge the serious lack of available data concerning jury diversity in Washington, as well as the substantial barrier that this lack of data creates for defendants seeking to prove a fair cross section violation. The Minority and Justice Commission Jury Diversity Task Force has "unanimously agreed on the importance of collecting jury demographic data and recommends the permanent statewide implementation of a system to collect juror demographics." JURY DIVERSITY TASK FORCE, *supra*, at 6. Commendably, the enactment of SSSB 5128 represents an important first step in implementing this recommendation, directing a system for collecting juror demographic data. *Supra* n.5 (quoting LAWS OF 2023, ch. 316, § 1). This centralized data collection system will not only aid criminal defendants in the context of fair cross section claims but is crucial to "help the state monitor whether and to what extent each [of the Task Force's] proposed [solutions] affect[] minority juror participation." JURY DIVERSITY TASK FORCE, *supra*, at 6.

*State v. Rivers*, No. 100922-4

system, as intended. Without predivide data, it is difficult to know whether the divide has produced systematic exclusion rather than *inclusion*, whether there is an offset, or what other consequences flow from the decision to subdivide the areas. A showing of statistical disparity over a short period in 2015, on its own, is insufficient under *Smith*, 559 U.S. 314, and does not persuade us that the decision to divide King County into Seattle and Kent jury districts has produced systematic exclusion within the meaning of *Duren*.

Rivers has not substantiated his theory of systematic exclusion with evidence as required by *Duren*, and for this reason we hold Rivers fails to establish a fair cross section violation.

II.    Rivers's Remaining Claims Do Not Warrant a New Trial, Though He Is Entitled to Resentencing

Beyond his fair cross section claim, Rivers seeks a new trial due to (1) the trial court's admission of expert testimony from an experienced Harborview nurse regarding the correlation between strangulation and memory loss and (2) the trial court's decision not to answer a written question from the jury regarding the mens rea of assault by suffocation and to instead refer the jury to its instructions. We hold that the trial court did not abuse its discretion on either occasion. However, Rivers argues and the State does not dispute that he is entitled to resentencing as a result of recent legislative amendments. We agree and remand to the trial court for a new sentencing hearing.

37

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

A. *The Trial Court Acted within Its Discretion in Qualifying a Nurse Witness as an Expert on the Relationship between Strangulation and Memory Loss*

Rivers claims the trial court erred in permitting expert testimony by a SANE, Theresa Stewart, on the correlation between strangulation and memory loss. Specifically, Rivers alleges Stewart lacked training as a psychologist, neurobiologist, or neuroscientist; that she had not researched the connection between strangulation and memory loss; and that her experience on this subject was limited to anecdotal observations and a single training video. According to Rivers, the testimony was beyond Stewart's area of expertise and therefore not helpful to the jury's understanding of the evidence.

We review the admission of expert testimony for abuse of discretion. *State v. Thomas*, 150 Wn.2d 821, 856, 83 P.3d 970 (2004). Reversal is warranted only where "no reasonable person would have decided the matter as the trial court did." *Id.* The evidence rules permit expert testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." ER 702. An expert may be qualified based on "knowledge, skill, experience, training, or education." *Id.* It is well established that an expert may be qualified by experience alone. *Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 355, 333 P.3d 388 (2014) (quoting *In re Marriage of Katare*, 175 Wn.2d 23, 38, 283 P.3d 546 (2012) (no abuse of discretion where trial court permitted expert testimony on topic of child abduction by attorney who worked in the field of child abduction for

38

17 years)). "'The witness need not possess the academic credentials of an expert; practical experience may suffice.'" *Harris v. Robert C. Groth, MD, Inc.*, 99 Wn.2d 438, 449, 663 P.2d 113 (1983) (quoting 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 289 (2d ed. 1982)).

The trial court sustainably qualified Stewart as an expert on the correlation between strangulation and memory loss. Stewart obtained her bachelor of science in nursing in 1989. In 2002, she completed a 40-hour didactic SANE training to become a forensic nurse. At the time of trial, Stewart had worked as a nurse examiner at Harborview Medical Center for 17 years. She has seen over 500 patients for sexual assault exams and estimates that approximately 15 percent of all sexual assault victims report strangulation. Stewart has performed strangulation examinations on both sexual assault and domestic violence patients in the course of her work at Harborview. Stewart occasionally performs forensic examinations specifically related to strangulation. When Stewart evaluates patients, the first thing she does is obtain a patient history of "as much as they're able to remember about what's happened to help guide the exam and the care" provided to the patient. 2 VRP at 735. Stewart also regularly attends trainings and conferences on sexual assault strangulation, pattern injuries, neurobiology, and related topics. She has trained other nurse examiners, law enforcement, prosecutors, and advocates on the

topic of sexual assault strangulation. She has been qualified as an expert and testified in court on the topic of strangulation approximately 20 times.

We cannot say that no reasonable person would have ruled as the trial court did here. Based on her experience and training, Stewart was qualified to render her expert opinion that memory loss is a symptom of strangulation. That Stewart lacked academic credentials on this particular subject goes to the weight of her testimony, not admissibility. *See State v. Flett*, 40 Wn. App. 277, 285, 699 P.2d 774 (1985) ("[O]nce basic requisite qualifications are established, any deficiencies in an expert's qualifications go to weight, rather than admissibility of testimony."). The record does indicate, as Rivers points out, that many of the trainings on strangulation that Stewart has either attended or planned recycle the same training video created by Dr. Rebecca Campbell, a neurobiologist who studies the effects of trauma. This, too, goes to the weight of Stewart's testimony, not admissibility. Moreover, the testimony was helpful to the trier of fact because it established that strangulation could have contributed to Power's memory loss from the evening of the alleged assault. The trial court acted well within its discretion in permitting Stewart's expert opinion on this topic.

B. *The Trial Court Acted within Its Discretion in Declining To Answer the Jury's Written Question*

Next, Rivers claims he is entitled to a new trial because the trial court declined to answer a question from the deliberating jury concerning the mens rea for assault

40

*State v. Rivers*, No. 100922-4

by suffocation. According to Rivers, the trial court was obligated to answer this question because it demonstrated the jury's confusion over the intent required to convict him of assault. The court's refusal to answer, he claims, relieved the prosecution of its burden of proving every element of the offense beyond a reasonable doubt. We disagree.

We review a trial court's decision of how best to respond to a deliberating jury's question for abuse of discretion. *State v. Becklin*, 163 Wn.2d 519, 529-30, 182 P.3d 944 (2008). Jurors are presumed to follow the court's instruction. *State v. Weaver*, 198 Wn.2d 459, 467, 496 P.3d 1183 (2021). We presume they read the instructions as a whole to discern the relevant legal standard. *Id.* A single jury question "does not create an inference that the entire jury was confused, or that any confusion was not clarified before a final verdict was reached." *State v. Ng*, 110 Wn.2d 32, 43, 750 P.2d 632 (1988) (no abuse of discretion where trial court declined to answer jury question because instructions already answered that question).

There was no abuse of discretion here. It is undisputed that the jury's instructions reflected an accurate statement of the law. Instruction No. 14 defined suffocation and expressly stated that it requires a person act with intent to block another's ability to breathe. The trial court acted reasonably when it declined to answer a question involving hypothetical facts about death by suffocation and instead referred the jury to the instructions already given, which contained an answer

41

*State v. Rivers*, No. 100922-4

to the jury's question. The instructions were legally correct, and we presume the jury followed them. *Weaver*, 198 Wn.2d at 467.

Rivers cites three primary cases in support of his argument, but each is readily distinguishable. In *State v. Sanjurjo-Bloom*, the trial court erred by admitting character evidence without a limiting instruction. 16 Wn. App. 2d 120, 127-28, 479 P.3d 1195 (2021). When the jury asked a question indicating it was considering this evidence for improper propensity purposes, the court "compounded" the existing error by failing to correct the jury's misunderstanding. *Id.* The Court of Appeals reversed not because the lower court declined to answer a jury question, but because the court permitted the jury to consider improper propensity evidence. *Id.* at 129-30. In Rivers's case, however, there was no existing evidentiary error the court was obligated to correct.

In *State v. Campbell*, one of the jury's instructions did not accurately inform the jury of the law. 163 Wn. App. 394, 401, 260 P.3d 235 (2011). When read as a whole, the instructions did not cure the deficiency. *Id.* "This error was compounded when, in response to the jury's question, the trial court referred the jurors back to the instructions already given rather than clarifying the applicable law." *Id.* at 401-02. Unlike *Campbell*, the jury instructions here correctly stated the law on assault, including the element of intent, and the trial court did not compound an existing error by declining to answer the jury's question.

42

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

In *State v. Backemeyer*, the jury asked multiple questions indicating it did not understand the law of self-defense. 5 Wn. App. 2d 841, 849, 428 P.3d 366 (2018). The issue on appeal was not whether the trial court abused its discretion in declining to answer the jury's questions, but whether defense counsel performed deficiently in repeatedly agreeing to tell the jury to simply refer to its instructions. *Id.* (holding defense counsel performed deficiently because he "had no legitimate strategy" in answering the jury's questions). Courts are particularly sedulous in ensuring that the standard for self-defense be manifestly clear to the jury, so the court appropriately found deficient performance by counsel in *Backemeyer* in light of the jury's obvious confusion. But that case does not compel the result that Rivers seeks here because he has not shown juror confusion on the elements of assault and he makes no claim that trial counsel performed deficiently.

In sum, the trial court acted well within its discretion when it responded to the jury's question by referring the jury to its instructions, which reflected an accurate statement of the law.

## C. *Rivers Is Entitled to Resentencing*

Although Rivers's other claims fail, he is entitled to a new sentencing hearing. Under the Persistent Offender Accountability Act, persistent offenders are sentenced to life imprisonment without the possibility of parole. RCW 9.94A.570. A "persistent offender" is one who has been convicted of three or more felonies

constituting "most serious offense[s]." RCW 9.94A.030(37)(a). In 2019, the legislature amended the categories of crimes constituting most serious offenses. After Engrossed Substitute Senate Bill 5288, second degree robbery no longer qualifies as a most serious offense. LAWS OF 2019, ch. 187, § 1 (amending RCW 9.94A.030(33)). In 2021, the legislature passed Engrossed Senate Bill 5164, which provides that defendants "must have a resentencing hearing if a current or past conviction for robbery in the second degree was used as a basis for the finding that the offender was a persistent offender." LAWS OF 2021, ch. 141, § 1 (effective July 25, 2021), *codified as* RCW 9.94A.647.

Rivers is entitled to resentencing under the amended statutes. He was sentenced in 2020 to life imprisonment without the possibility of parole under the Persistent Offender Accountability Act. This sentence was based in part on his two prior convictions for second degree robbery. Rivers therefore must receive a resentencing hearing because his "past conviction[s] for robbery in the second degree" served as the basis for his sentence as a persistent offender. RCW 9.94A.647.

CONCLUSION

We affirm Rivers's convictions and remand for a resentencing hearing. We decline to adopt Rivers's proposed state constitutional tests and instead analyze his fair cross section claim under the existing *Duren* test. Applying that test here, we

44

*State v. Rivers*, No. 100922-4

conclude Rivers fails to establish systematic exclusion and therefore has not carried his burden of demonstrating a constitutional violation. In addition, we hold that the trial court reasonably exercised its discretion in permitting Ms. Stewart's expert testimony on the correlation between strangulation and memory loss and in answering the jury's question regarding assault by suffocation by referring the jury to its instructions. While Rivers is not entitled to a new trial, we vacate his sentence and remand for resentencing because RCW 9.94A.647 no longer allows a persistent offender life sentence based on prior second degree robbery convictions.

_____
Stephens, J.

WE CONCUR:

_____      _____
                                              Gordon McCloud, J.

_____      _____
       Johnson, J.                                          Yu, J.

_____      _____
       Madsen, J.

_____      _____
       Owens, J.                                      Whitener, J.

45

No. 100922-4

GONZÁLEZ, C.J. (concurring) — Those charged with a crime have a right to be tried before a jury drawn from a fair cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 527, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975). A fair cross section of the community on venires, panels, or lists from which juries are drawn "is essential to the fulfillment of the Sixth Amendment's guarantee of an impartial jury trial in criminal prosecutions." *Id.* at 526; U.S. CONST. amend. VI. It also "preserv[es] 'public confidence in the fairness of [our] criminal justice system.'" *Lockhart v. McCree*, 476 U.S. 162, 174-75, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986) (quoting *Taylor*, 419 U.S. at 530-31).

Long-standing precedent puts the burden on the defendant to show that the pool of potential jurors does not represent a fair cross section of the community. While this accords with the regular course of judicial review, the truth is that the defendant does not have access to the information that would allow them to meet that burden. Whether the jury pool in fact represents a fair cross section of the community is a matter courts have all too often taken on faith, often in the face of considerable reasons to think otherwise. When a defendant cannot meaningfully

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

challenge the cross section from which their jury panel is drawn it undermines both the fairness of the process and public confidence.

As the majority properly acknowledges, jury pools have historically not been drawn from that fair cross section. Justice demands more than we have done. Under the impossible burden established by *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979), the controlling federal precedent, Paul Rivers has not established that he is entitled to relief. Nor has he done the work to establish a right to a different result under our state constitution. Accordingly, I reluctantly concur with the majority.

I write separately to express my deep concern with the unworkable legal framework set forth in *Duren* and the inadequate steps we have taken to make our jury pools represent a fair cross section of our communities. *Duren* has failed and we have failed. We—judges, court clerks, and the legislature—must do more.

I.    APPLICATION OF DUREN STANDARD

*Duren* articulated a three-pronged test for fair cross section challenges. When a defendant raises a fair cross section challenge, they must make a prima facie showing:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Id.* at 364.  The defendant is not required to show intentional or purposeful discrimination.  As Justice Rehnquist noted in his dissenting opinion in *Duren*, "under equal protection analysis prima facie challenges are rebuttable by proof of absence of intent to discriminate, while under Sixth Amendment analysis intent is irrelevant." *Id.* at 371.  Once the defendant has made this prima facie showing, the burden shifts to the State to justify the infringement "by showing attainment of a fair cross section to be incompatible with a significant state interest." *Id.* at 368 (citing *Taylor*, 419 U.S. at 533-35).

Duren had challenged a state law that exempted women from jury service upon their request. *Id.* at 360.  Near the time of Duren's trial, women represented approximately 54 percent of the population eligible for jury service but only 26.7 percent of those summoned and 14.5 percent of those on venires.  *Id.* at 362-63, 367.

The Court rejected the State's argument that Duren failed to show the exemption of women on request had "'any effect' on or was responsible for the underrepresentation of women on venires." *Id.* at 368.  The Court held Duren had made a "prima facie showing of an infringement" of his fair cross section right.  *Id.* at 368. In essence, the *Duren* Court did not require a stringent showing of causation to meet the systematic exclusion prong.  *See* Nina W. Chernoff, *Wrong*

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Rivers*, No. 100922-4 (González, C.J., concurring)

*About the Right: How Courts Undermine the Fair Cross-Section Guarantee by Confusing It with Equal Protection*, 64 HASTINGS L.J. 141, 163 (2012).

The Court arguably required a more particularized showing of the cause of the disparity in *Berghuis v. Smith*, 559 U.S. 314, 130 S. Ct. 1382, 176 L. Ed. 2d 249 (2010). There, Smith challenged Kent County's jury assignment order that assigned jurors first to district courts then to circuit courts. The city of Grand Rapids made up 37 percent of Kent County, and Black residents made up 85 percent of Grand Rapids. *Id.* at 322. Smith alleged that the order siphoned Black jurors from the circuit court to the district court, resulting in an underrepresentation of Black jurors in the circuit court where his trial was held. He provided evidence showing a drop in the comparative underrepresentation of Black jurors from 18.0 percent to 15.1 percent after the order was discontinued, but the court concluded that Smith failed to show that the order *caused* the underrepresentation. *Id.* at 331. In my view, the constitutional guaranty to a fair cross section should not be so constrained.

Nevertheless, our court has followed federal courts and repeatedly applied this strict reading of *Duren* in consistently rejecting fair cross section claims. *See In re Pers. Restraint of Yates*, 177 Wn.2d 1, 20-23, 296 P.3d 872 (2013); *State v. Cienfuegos*, 144 Wn.2d 222, 232, 25 P.3d 1011 (2001); *In re Pers Restraint of Lord*, 123 Wn.2d 296, 312, 868 P.2d 835 (1994); *State v. Rupe*, 108 Wn.2d 734,

747-48, 743 P.2d 210 (1987); *see also* David M. Coriell, *An (Un)fair Cross Section: How the Application of* Duren *Undermines the Jury*, 100 CORNELL L. REV. 463, 465 (2015) (concluding that a strict reading of *Duren* places "a high bar [on the defendant] that often renders the fair cross section guarantee illusory") Today, we add Rivers to this unpleasant legacy of fair cross section claims.

Rivers contends that King County Superior Court's procedure of dividing its jury source list into two assignment areas systematically excludes Black panel members from the "Seattle Jury Assignment Area." His contention is supported by a report by Professor Katherine Beckett, albeit a report that was limited by considerable constraints. Dr. Beckett analyzed (1) juror summons information for each zip code in King County and the separate assignment areas for the year of 2015, aggregated with the latest United States census data, and (2) juror survey responses conducted in both the Seattle and Kent courthouses from January to April 2015. Clerk's Papers (CP) at 111-13. This data showed that only 4 percent of eligible jurors in the Seattle Jury Assignment Area were Black, whereas more than 8 percent of the "Kent Jury Assignment Area" were Black. CP at 113. The numbers are even more concerning when we consider that only 2 percent of jurors who showed up for jury duty in the Seattle Jury Assignment Area were Black. *Id.* But without equally powerful analysis comparing the disproportionality of the jury pools that would exist without the assignment areas, I am constrained to agree with

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the majority that under *Duren*, this is insufficient to demonstrate systematic exclusion. *See* majority at 36. However, it strongly suggests we need to do better.

II.    BURDEN UNDER *DUREN*

The majority suggests that Rivers could have made a prima facie showing by providing juror data predating the adoption of King County Superior Court's Local General Rule (LGR) 18 to test if the rule had operated as intended and, if not, whether it systematically excluded Black jurors. *Id.* LGR 18 was adopted after King County judges observed that the general inverse relationship between the distance from the courthouse and the likelihood of appearing in response to a juror summons was more pronounced when the juror was lower income or a person of color. *State v. Lanciloti*, 165 Wn.2d 661, 664, 201 P.3d 323 (2009). Whether LGR 18 has worked as intended is absolutely something that should be tested. The majority suggests this data might have shown "whether the divide has produced systematic exclusion rather than *inclusion* . . . or what other consequences flow from the decision to subdivide the areas." Majority at 36. But it is unrealistic to think that this is a showing an individual defendant should be able to make in the heat of trial. It illustrates the difficulty defendants face when trying to enforce their Sixth Amendment fair cross section right.

*State v. Rivers*, No. 100922-4 (González, C.J., concurring)

a.  DEFENDANT'S BURDEN AND LACK OF JUROR INFORMATION

Such an approach to establishing the prima facie case demonstrates the nearly impossible burden under *Duren* today.  Defendants depend largely on our courts for access to jury information.  This information is not complete and cannot be easily analyzed.  In addition, some courts do not consistently track juror demographic information.[1] Under our court rules, such information is presumed to be private, and, in most cases, requests for this information will be granted by the court only upon a showing of good cause and *after* the conclusion of the trial.  GR 31(j).  The record in this case shows that King County does not regularly collect data regarding the race of its jurors.  CP at 159.  However, to mount a successful fair cross section challenge, defendants "need the government's data about the race of potential jurors . . . [and] access to the operation of the system to understand the *source* of the disparity."  Nina W. Chernoff, *No Records, No Right: Discovery & the Fair Cross-Section Guarantee*, 101 IOWA L. REV. 1719, 1734-35 (2016).  An inability to access such information can be fatal to Sixth Amendment fair cross section claims.

---

[1] *See* JURY DIVERSITY TASK FORCE, MINORITY & JUST. COMM'N, 2019 INTERIM REPORT 6 n.7 (2019), https://www.courts.wa.gov/subsite/mjc/docs/Jury%20Diversity%20Task%20Force%20 Interim%20Report.pdf (citing N.Y. JUD. LAW § 528) (concluding that New York is the only state collecting juror demographics and recommending that juror demographic data be collected on a permanent statewide basis in Washington State).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

This was illustrated in *Cienfuegos*, 144 Wn.2d 222, and *State v. Lopez-Ramirez*, No. 75546-3-I (Wash. Ct. App. Feb. 12, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/755463.PDF.  On appeal, Cienfuegos argued that he was prevented from making a prima facie showing of a fair cross section violation because he did not have access to racial demographics about the potential jurors—either by the trial court's refusal to provide him the jury list so he could contact the jurors to determine their race for purposes of his appeal or by the compilation of the jury list itself because it does not collect information about the juror's race.  *Cienfuegos*, 144 Wn.2d at 232.  There, the court concluded that his bare allegations that the jury list was not representative of the community was not sufficient enough to bring the issue into play.  We held that Cienfuegos did not meet the requisite prima facie showing.  *Id*.

In *Lopez-Ramirez*, the defendant moved for a jury drawn from a fair cross section of the community before trial, arguing that Black residents in King County were underrepresented in jury venires.  He requested access to demographic information on potential jurors in the jury assembly room, but the trial judge declined to provide such information.  *Lopez-Ramirez*, No. 75546-3-I, slip op. at 8-9. Similar to Rivers, Lopez-Ramirez relied on the same report from Professor Beckett.  The Court of Appeals held that Lopez-Ramirez failed to meet his burden under *Duren*.  *Id*. at 13.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The "cross-section requirement [is] without meaning if a defendant [is] denied all means of discovery in an effort to assert that right." *State ex. rel. Garrett v. Saitz*, 594 S.W.2d 606, 608 (Mo. 1980). The Iowa Supreme Court recognized this in *State v. Plain*, where it held that the defendant could not make his prima facie case because he was denied access to historical data regarding jury information to which he was entitled. 898 N.W.2d 801, 828, 836-37 (Waterman, J., concurring specially) (Iowa 2017).[2] The New Jersey courts have taken great strides toward making the promise of a fair cross section meaningful in the wake of *State v. Andujar*, 247 N.J. 275, 254 A.3d 606 (2021). *See* N.J. CTS., JURY SELECTION UPDATES: (1) STRATEGIES TO ADDRESS BIAS; (2) AMENDMENTS TO COURT RULES; AND (3) NEW RULE 1:8-3A (Aug. 2022), https://www.njcourts.gov/sites/default/files/attorneys/jury-reforms/statewidejuryreforms.pdf [https://perma.cc/G9ZZ-9E6A]. I applaud the legislature for taking a substantial step toward making the promise of a fair cross section meaningful. *See, e.g.*, LAWS OF 2023, ch. 316. But more is required.

### b. STATE'S BURDEN TO JUSTIFY INFRINGEMENT

Even under the existing inadequate *Duren* test, I am concerned that putting the burden on the defendant to show a difference before and after adoption of LGR

---

[2] *Plain* also discusses several jurisdictions that have established that the Constitution requires that defendants have access to juror information in order to enforce their Sixth Amendment fair cross section right. 898 N.W.2d at 828.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

18 makes rebutting the State's justification part of the prima facie case. It also confuses the State's burden in a fair cross section challenge under the Sixth Amendment—to show that attaining a fair cross section is incompatible with some significant state interest—with its burden in an equal protection challenge. Once a defendant makes a prima facie case of intentional discrimination under the equal protection clause, the State bears the burden of showing there is no intentional discrimination. No such showing of intent is required under the Sixth Amendment. *Duren*, 439 U.S. at 368. Once the defendant shows systematic exclusion exists, the only remaining question is whether the infringement on defendant's right is justified. *See id.* at 368 n.26.

The State seems to suggest that since its intentions are good and the rule rational, the Sixth Amendment has not been violated. Br. of Resp't at 38. That is not sufficient as "'[t]he right to a proper jury cannot be overcome on merely rational grounds.'" *Duren*, 439 U.S. at 367 (alteration in original) (quoting *Taylor*, 419 U.S. at 534). The State must provide proof. *See also Smith*, 559 U.S. at 332-33 (explaining that when the State argued that the exemption complained of *did not* cause the systematic exclusion, the State must demonstrate how the other exemptions, that would justify failure to achieve a fair cross section, are the cause of the systematic exclusion).

*State v. Rivers*, No. 100922-4 (González, C.J., concurring)

      III.     ENFORCING THE RIGHT TO A FAIR CROSS SECTION

Our state has made considerable efforts over the years to make our juries more reflective of the community. I commend the ongoing work of stakeholders to find and fund ways to track and increase juror participation. However, the lack of diverse juries in our criminal justice system still persists. Therefore, it is important that a defendant be able to enforce their Sixth Amendment cross section right with access to appropriate juror demographic information essential to making a prima facie case of systematic exclusion. *See* Letter from Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. 1 (June 4, 2020), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf [https://perma.cc/QNT4-H5P7] ("[W]e must recognize the harms that are caused when meritorious claims go unaddressed due to systemic inequities.")

We should hold ourselves accountable and scrutinize our own court rules and procedures that govern the jury selection process and access to juror records to amend or craft such rules to reflect what we have learned about the shortcomings of *Duren*. *See* GR 31(j) (allowing defendants access to limited juror information upon a showing of good cause and only *after* the conclusion of the trial); GR 18(b) (requiring that jury source lists include *only* the juror's name, date of birth, gender, mailing and residential address).

*State v. Rivers*, No. 100922-4 (González, C.J., concurring)

Our state legislature should also consider how Congress has responded to the challenge that defendants face in obtaining information to support such claims in the federal courts. *See Garrett*, 594 S.W.2d at 608. Federal law commands that courts preserve all jury records and papers for "public inspection for the purpose of determining the validity of the selection of any jury." 28 U.S.C. § 1868; *see also* 28 U.S.C. § 1867 (allowing defendants to present such records as evidence in challenging the jury selection process).

I concur with the majority that under existing law and based on the factual showing made, Rivers is not entitled to relief. But his case starkly points out how jury pools in this state do not resemble the people of this state. Now that we know better, we must do better.

With these observations, I concur with the majority.

_____
González, C.J.

_____
Montoya-Lewis, J.

12